| STATE OF LOUISIANA | * | NO. 2019-KA-0675 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| TRAVIS BOYS | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

**CONSOLIDATED WITH:**

STATE OF LOUISIANA

VERSUS

TRAVIS BOYS

**CONSOLIDATED WITH:**

STATE OF LOUISIANA

VERSUS

TRAVIS BOYS

**CONSOLIDATED WITH:**

STATE OF LOUISIANA

VERSUS

TRAVIS BOYS

**CONSOLIDATED WITH:**

STATE OF LOUISIANA

VERSUS

TRAVIS BOYS

**CONSOLIDATED WITH:**

NO. 2017-K-0866

**CONSOLIDATED WITH:**

NO. 2017-K-0867

**CONSOLIDATED WITH:**

NO. 2018-K-0217

**CONSOLIDATED WITH:**

NO. 2018-K-0241

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 525-362, SECTION "I"
Honorable Karen K. Herman, Judge

* * * * * *

**Judge Daniel L. Dysart**

* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Daniel L. Dysart, Judge Dale N. Atkins)

Jason Rogers Williams
District Attorney, Orleans Parish
G. Benjamin Cohen
Chief of Appeals
David B. LeBlanc
Assistant  District Attorney
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR STATE/APPELLEE

Anna K. VanCleave
127 Wall Street
New Haven, CT 06515

Emily Washington
Hannah Lomers-Johnson
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, LA 70119

      COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**

**May 26, 2021**

**DLD**
**JFM**
**DNA**

Defendant, Travis Boys, was convicted by a unanimous jury of the first-degree murder of Officer Daryle Holloway, a twenty-plus-year veteran of the New Orleans Police Department (NOPD). Mr. Boys was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

At trial, there was no question that Mr. Boys killed Officer Holloway. At the time of his death, Officer Holloway had been wearing a body camera, which he activated after Mr. Boys was placed in the back seat of his police vehicle. The body camera clearly recorded his murder, leaving no doubt that Officer Holloway's death was at Mr. Boys' hands. Officer Holloway's body camera footage depicts Officer Holloway driving the vehicle, when a loud bang is heard. Although Officer Holloway's body camera fell off at that point, it captured a struggle over a firearm between Officer Holloway and Mr. Boys. While the footage of the struggle only captured their arms, Mr. Boys is heard repeatedly stating, "let me out before you kill yourself." Mr. Boys can next be seen in the front of the police car, having climbed through the partition, his hands handcuffed in front and with a firearm in his hand. The footage then shows Mr. Boys opening the front passenger-side door and fleeing the scene.

1

Mr. Boys has never argued that he did not kill Officer Holloway. He has, however, appealed his conviction and sentence, raising numerous assignments of error, which he maintains require a reversal of his conviction.

Having carefully reviewed the record of this matter, we find no merit to any of Mr. Boys' assignments of error. We therefore affirm Mr. Boys' conviction and sentence.

**FACTS AND PROCEDURAL HISTORY**

In the early morning hours of June 20, 2015, the NOPD received a 911 call from Mr. Boys' wife, Ava Boys, who reported that Mr. Boys had fired a gun at her, and requested that the police come and remove Mr. Boys from their residence. Former NOPD Officer Wardell Johnson[1] responded to the call and arrived at the Boys' residence around 4:45 a.m. Mr. Johnson arrested Mr. Boys and transported him to the Fifth District police station. Mr. Boys remained in the back seat of Mr. Johnson's police vehicle until around 8:00 a.m., while Mr. Johnson completed the necessary paperwork. Because Mr. Johnson's shift had ended, Officer Holloway offered to transport Mr. Boys to jail. It was during that transport that Mr. Boys pulled out a hidden gun that had not been discovered during his arrest and shot Officer Holloway. The struggle over the weapon then ensued and Mr. Boys made his escape. Mr. Boys was arrested the following day.

On June 29, 2015, the State indicted Mr. Boys for the first degree murder of Officer Holloway, a violation of La. R.S. 14:30. Mr. Boys initially pled not guilty; however, he later changed his plea to not guilty and not guilty by reason of insanity.

---

[1] Mr. Johnson was terminated by NOPD in November 2015 arising out of his non-compliance with certain police protocol surrounding Mr. Boys' arrest.

Pursuant to Mr. Boys' request for a sanity commission, the trial court appointed Dr. Rafael Salcedo, a forensic psychologist, and Dr. Richard Richoux, a forensic psychiatrist. Dr. James McConville, a forensic psychiatrist, was retained by Mr. Boys. The first of three competency hearings took place on September 21, 2017 (Competency Hearing I). After Competency Hearing I, the trial court found Mr. Boys competent to stand trial.

Mr. Boys' first trial date was October 18, 2017. The trial was halted during voir dire when Mr. Boys ingested and smeared himself with feces ("the fecal incident").[2] A second competency hearing then occurred on October 19, 2017 (Competency Hearing II). After hearing testimony from Dr. Richoux, Dr. Sarah Deland, a forensic psychiatrist retained by Mr. Boys after the fecal incident, and Dr. McConville, the trial court determined that Mr. Boys was incompetent and remanded him to the Eastern Louisiana Mental Health System (ELMHS) for evaluation.[3]

After Mr. Boys was released from the ELMHS, a third competency hearing was held on November 30, 2017 (Competency Hearing III). Mental health professionals from ELMHS, Dr. John Thompson, Dr. Laura Brown, and Dr. Sankey Vyat testified that Mr. Boys was competent.[4] Defense expert, Dr. McConville, indicated his opinion that Mr. Boys was incompetent. At the hearing's conclusion, the trial court found Mr. Boys competent to stand trial.

---

[2] During jury selection, Mr. Boys removed feces from a bag he had secreted on his person, and smeared it on his face (and apparently ingested it as well).

[3] The State objected to this finding and filed an application for a writ of supervisory review of this ruling with this Court, which was denied. *State v. Boys*, 18-0241 (La. App. 4 Cir. 3/23/18) (*unpub.*), *writ denied*, 18-0461 (La. 3/26/18) (*unpub.*).

[4] Drs. Thompson and Vyat are forensic psychiatrists, and Dr. Brown is a forensic psychologist.

Trial commenced on March 14, 2018. During the voir dire phase of trial, and after a jury, including alternates, had been selected from three voir dire panels, Mr. Boys lodged a challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), maintaining that the State disproportionately used its peremptory challenges to exclude black jurors. The trial court denied the *Batson* challenge and the trial proceeded.

On March 24, 2018, the jury unanimously found Mr. Boys guilty as charged. Mr. Boys sought, and was denied, a new trial. Sentencing delays were then waived and the trial court sentenced Mr. Boys to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Mr. Boys' motion to reconsider sentence was denied.

This appeal followed.

**ERRORS PATENT**

As is our practice, we have reviewed the record for errors patent.[5] Our review reveals no errors patent on the face of the record.[6]

We now turn to assignments of error Mr. Boys raises in this appeal: (1) the trial court erred in denying his *Batson* challenge by failing to find a prima facie case of racial discrimination in the State's jury selection; (2) the State's use of racially inflammatory language and themes deprived Mr. Boys of a fair trial; (3) the State impermissibly elicited other crimes evidence; (4) the trial court erred in issuing a jury instruction on other crimes evidence; (5) the State denigrated defense counsel in violation of Mr. Boys' right to a fair trial; (6) the State made improper

---

[5] *See State v. Hawkins*, 16-0458, p. 13 (La. App. 4 Cir. 5/17/17), 219 So.3d 1133, 1141.

[6] We note that the jury verdict sheet indicated and the trial court recognized that the first degree murder conviction was unanimous.

4

remarks during its closing argument; (7) the trial court erred in finding Mr. Boys competent to stand trial; (8) the trial court erred in permitting the court-appointed sanity commission members to testify about statements made in their competency evaluation of Mr. Boys, in violation of the his Fifth Amendment right against self-incrimination, where Mr. Boys had been promised that such statements could not be used against him; (9) the trial court erred in permitting scientifically unsound testimony from the State's experts regarding Mr. Boys' intellectual disability; (10) the trial court erred in permitting the State's experts to testify about their competency evaluation findings where defense counsel had relied on the trial court's pre-trial ruling that such testimony was inadmissible; (11) the trial court erred in excluding evidence of Mr. Boys' mental illness; (12) the "police-dominated atmosphere" violated Mr. Boys' right to a fair trial; (13) the trial court's imposition of a life sentence for an intellectually disabled Mr. Boys was constitutionally excessive; and (14) cumulative errors require reversal.

Because some of these issues are interrelated, those issues will be addressed together.

**ASSIGNMENT OF ERROR NO. 1**

In his first assignment of error, Mr. Boys maintains that the trial court improperly denied his *Batson* challenge by failing to find that he demonstrated a prima facie case of racial discrimination in the State's jury selection. He advances the following two arguments in support of his position: (1) the State "exercised eight of their eleven peremptory strikes—seventy-three percent—against available Black jurors," reducing black representation from the venire pool to the seated jury by twenty-five percent; and (2) potential black jurors peremptorily struck by the

5

State provided similar answers to seated white jurors, suggesting that they were struck on the basis of race.

The record reflects that, following voir dire and the impaneling of the jury—including three alternates—Mr. Boys lodged a *Batson* challenge stating the following:

> The State exercised [sic] of its 11 peremptorys [sic] and 3 alternate peremptorys[sic], they exercised 8 peremptorys [sic] against African-American jurors, or only 4 against white jurors.
>
> If you actually exclude the alternate jurors, it is 8 African-American jurors and 3 white jurors.
>
> I believe, given the disproportionate use of peremptory challenges against African-Americans, it creates a prima facie case of discrimination that requires the court to move forward to the next step of the analysis and require a (inaudible).

The trial court asked the State's response. The State replied, "[Y]our Honor, I think the fact that what we've chosen is actually racially diverse peremptory challenges. We have not discriminated in any way—African American or white or anything. We simply based our cuts on the responses that were provided to the State." The State also noted that Mr. Boys had exercised eight peremptory strikes against white persons. The trial court then ruled:

> I'll note for the record that I don't find that there's a prima facie basis for pursuing the next level of a *Batson* challenge. Noting for the record, that there [sic] four peremptory challenges used in the State's exercise that are white jurors, in addition to the African-American jurors.
>
> And I don't find that the burden has been satisfied.

Deliberate racial discrimination in the jury selection process violates a defendant's right to the equal protection a jury trial is intended to secure. *Batson*, 476 U.S. at 86. Accordingly, the United States Supreme Court has set forth a

6

three-step process to determine whether a peremptory challenge is premised solely on race:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [*Batson*,] 476 U.S.[] at 93-94, 106 S.Ct. 1712 (citing *Washington v. Davis,* 426 U.S. 229, 239-242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [*Batson*,] 476 U.S.[] at 94, 106 S.Ct. 1712; [*see also*] *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide [. . .] whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*).

*Johnson v. California*, 545 U.S. 162, 168 (2005) (footnote omitted).[7]

To meet the first prong of proving prima facie discrimination, a defendant must establish that: (1) he is a "member of a cognizable racial group"; (2) the State exercised peremptory challenges to remove jurors of the defendant's race; and (3)

---

[7] These holdings have been codified in Louisiana law as well, under La. C.Cr.P. art. 795 (C) and (D), which provide as follows:

> C. No peremptory challenge made by the state or the defendant shall be motivated in substantial part on the basis of the race or gender of the juror. If an objection is made that a challenge was motivated in substantial part on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court shall demand a satisfactory race or gender neutral reason for the exercise of the challenge. Such demand and disclosure shall be made outside of the hearing of any juror or prospective juror. The court shall then determine whether the challenge was motivated in substantial part on the basis of race or gender.

> D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C of this Article and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.

proffered "facts and any other relevant circumstances raise an inference" that the State struck the potential jurors solely "on account of their race." *Id.*, 545 U.S. at 169, 125 S.Ct. at 416-17 (quoting *Batson*, 476 U.S. at 94). A wide variety of evidence may be offered to make a prima facie case of discrimination, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose. *Johnson*, 545 U.S. at 169, 125 S.Ct. at 2416 (quoting *Batson*, 476 U.S. at 94). However, if a defendant fails to make out a prima facie showing of intentional discrimination, the inquiry ends there and does not advance to the second step requiring a race-neutral explanation from the State. A reviewing court should not disturb a trial court's ruling on the issue of discriminatory intent unless it is clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

In the instant case, Mr. Boys met the first two elements to prove prima facie discrimination in that he is "a member of a cognizable racial group" (African-American (black)) and that the State peremptorily struck more potential black jurors than potential white jurors. Thus, Mr. Boys' remaining burden to establish prima facie discrimination was to proffer facts and cite other relevant circumstances to infer that the State's peremptory challenges were based solely on race.

Mr. Boys reiterates that the State's use of eight of its eleven peremptory strikes against available black jurors raised such an inference. For the first time on appeal, however, Mr. Boys supplements that contention by arguing that a comparative juror analysis shows that the State's race-neutral reasons for its strikes were invalid because the black jurors struck by the State provided similar

8

responses as seated white jurors. He further argues that the State struck an "ideal" black juror who gave State-friendly answers.[8]

The State disputes that it struck black jurors on the basis of race. It further argues that Mr. Boys' supplemental arguments concerning the validity of the State's peremptory challenges are not properly before this Court because these arguments were not raised at trial. At the time he asserted his *Batson* challenge in the trial court, Mr. Boys relied exclusively on the number of black jurors struck by the State. Accordingly, the State contends this Court should limit its appellate review to the same evidence Defendant presented to the trial court.

Mr. Boys counters by arguing that a reviewing court should consider all of the circumstances that bear upon the issue of racial animus when a *Batson* challenge is raised, including a comparative juror analysis, even if a defendant failed to bring the complained-of circumstances to the trial court's attention. In support of this position, Mr. Boys relies on *Snyder v. Louisiana*, 552 U.S. 472 (2008). In *Snyder*, the Supreme Court permitted a comparative juror analysis in finding racial discrimination, although the defendant had failed to specifically reference the jurors' responses in articulating his prima facie showing of racial discrimination before the trial court.

We find *Snyder* distinguishable from the present matter. In *Snyder*, even without the comparative juror analysis evidence, the trial court had already determined that the defendant had made a prima facie showing and accordingly, had required the State to provide a race-neutral reason for its strikes. Moreover,

---

[8] The record reflects that both the State *and* Mr. Boys exercised peremptory challenges of this "ideal" juror. Accordingly, pursuant to La. C.Cr.P. art. 795(D), a *Batson* analysis for this particular juror is unwarranted inasmuch as both parties challenged this juror. *See* n. 7.

9

the trial court had, in fact, thoroughly analyzed the jurors' responses. Thus, although the *Snyder* defendant had not raised the exact issue of comparative juror responses in making his prima facie showing, the trial court had been afforded the opportunity to evaluate the jurors' answers in the context of the State's race-neutral reasons for exercising its strikes. By contrast, in the instant matter, the trial court did not find a prima facie showing of racial discrimination and thus, no thorough analysis of the juror responses took place.

As the Louisiana Supreme Court has noted, a defendant satisfies the first requirement of a *Batson* challenge "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *State v. Draughn*, 05-1825, p. 25 (La. 1/17/07), 950 So.2d 583, 603 (quoting *Johnson*, 545 U.S. at 170). "[I]f such an inference cannot be drawn *from the evidence presented by the defendant*, he is unable to make a prima facie case of purposeful discrimination and his *Batson* challenge expires at the threshold." *State v. Williams*, 13-0283, pp. 16-17 (La. App. 4 Cir. 9/7/16), 199 So.3d 1222, 1232-33 (emphasis added) (quoting *State v. Sparks*, 88-0017, pp. 37-38 (La. 5/11/11), 68 So.3d 435, 468-69)). "To withhold in the trial court a fact-specific argument in support of a *Batson* challenge carries with it all of the unfairness of holding challenges until 'trial has concluded unsatisfactorily,' and ought not to be permitted or encouraged." *State v. Youngblood*, 18-445, p. 22 (La. App. 5 Cir. 5/22/19); 274 So.3d 716, 737, quoting *Delvalle v. Herbert*, 2004 WL 1661075 (U.S. S.D.N.Y. 2004)), *rev'd and remanded other grounds,* 19-01160 (La. 6/3/20), 296 So.3d 1022.

We acknowledge that "a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination," *Miller-El v. Dretke*, 545 U.S.

10

231, 240 (2005) (quoting *Batson*, 476 U.S. at 96-97). However, here, Mr. Boys relied solely on the number of black jurors struck by the State to support the inference of racial discrimination in the trial court. Therefore, once the trial court determined that the number of the strikes did not support a prima facie case of racial discrimination, the State was relieved of any obligation to provide a race neutral reason for its strikes. Hence, the State's explanation that its strikes were based on juror responses was not a necessary consideration by the trial court in its ruling.

Moreover, as the State correctly notes, "[i]t is well settled that a new basis for an objection cannot be raised for the first time on appeal." *See State v. Sims*, 426 So.2d 148, 155 (La. 1983). We therefore do not consider those arguments Mr. Boys failed to raise at the time of Mr. Boys' *Batson* challenge, and as such, need not conduct a comparative juror analysis in determining the legitimacy of the State's purported reasons for its strikes when Mr. Boys neglected to cite or proffer a juror analysis of those reasons at trial.[9] Instead, the relevant inquiry into whether Mr. Boys made a prima facie showing of racial discrimination shall be limited to the supporting evidence he, in fact, proffered before the trial court; namely,

---

[9] The Supreme Court has also indicated that a comparative juror analysis was meant to be considered during *Batson's* third step in consideration of the prosecution's race-neutral reasons. "More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). Even if this Court were to undertake a comparative juror analysis, it would be Mr. Boys' burden to furnish a sufficient record. *See Williams*, 13-028, p. 20, 100 So.3d at 1235 (quoting *United States v. Dawn*, 897 F.2d 1444, 1448 (8th Cir.1990)) ("[A] defendant who requests a prima facie finding of purposeful discrimination is obligated to develop a record, beyond numbers, in support of the asserted violation."). In this case, the voir dire transcripts reveal that, while the State addressed every juror it questioned by name, Mr. Boys did not. Accordingly, we cannot conclusively assign juror responses to specific jurors during Mr. Boys' voir dire.

evidence that the State improperly utilized eight of its eleven peremptory challenges against black jurors.

At the outset, we note that while Mr. Boys alleges that the State used eight of its eleven peremptory challenges against black jurors, the trial court's jury panel sheet identifies one of those jurors, Mr. Sylve, as a white male.[10] Based on the record, we shall utilize the trial court's jury panel sheet which indicates the State struck seven, rather than eight black jurors. That notwithstanding, our review of the potential racial discriminatory impact of the State's strikes against black jurors is unaffected by the minimal statistical difference between seven or eight strikes.

The trial court's jury panel sheet shows the jury venire pool initially consisted of sixty-eight total jurors, thirty-eight of whom were black (56%). Thirty-nine potential jurors remained after cause challenges, seventeen of whom were black (44%), and twenty of whom were white (51%). Of the seventeen black potential jurors who remained, the State struck seven peremptorily. The final composition of the twelve-person jury included five black jurors (42%), six white jurors (50%), and one Asian juror (8%). Of the three alternates selected, two were black and one was white. Thus, the demographic makeup of the entire jury, including the alternates, was seven black jurors (47%), seven white jurors (47%), and one Asian juror (6%).

In this matter, each party was afforded twelve peremptory strikes for the main jury selection, and three additional peremptory strikes in the selection of three alternate jurors, for a total of fifteen peremptory strikes in the entire jury

---

[10] We take the demographic analysis of the jury pool from the trial court's jury sheet that was placed under seal. A discrepancy exists as to whether Mr. Sylve is black or white; however, because the trial court listed Mr. Sylve listed as a "W/M" on its jury sheet, and there is no other evidence from which to base a more definitive conclusion, our analysis presumes Mr. Sylve is a white male.

selection process. Of those, the State exercised a total of thirteen peremptory strikes.

As the record reflects, black jurors approximated fifty-six percent or half of the total jury venire pool. While black representation of the total jury venire pool decreased from fifty-six percent to forty-four percent following legitimate cause challenges,[11] the final jury composition consisted of forty-two percent black jurors, only a two percent decrease from the potential jurors who remained. When including the alternate jurors, the potential black representation actually increased by three percent (from 44% to 47%). Additionally, of the State's fifteen available peremptory strikes, it utilized seven to strike black jurors (fewer than half— 47%).[12] Notwithstanding the State's peremptory strikes against black jurors, ultimately, black jurors constituted almost half of the resulting seated jurors. Indeed, when alternates are included, the jury included the same number of black and white jurors. Thus, we find the record does not support Mr. Boys' assertion that black representation from the jury venire panel to seated jurors was significantly decreased by the State's peremptory strikes.

Louisiana courts recognize "that peremptory challenges, by reason of the fact that they may be subjectively based, constitute a jury selection practice which may allow those who intend to discriminate to do so." *Draughn*, 05-1825, p. 25, 950 So.2d at 603. In *Batson*, for example, the prosecutor used peremptory strikes to excuse all four black jury veniremen, leaving only white jurors on the seated jury, which the Supreme Court found constituted a prima facie case of

---

[11] Mr. Boys does not complain on appeal of any of the trial court's rulings on cause challenges.

[12] Even if the State struck eight black jurors as Mr. Boys asserts, that is 53% of the State's total peremptory challenges allowed.

13

discrimination against a black defendant in a case with a white victim. Similarly, in *Johnson*, the State used peremptory strikes to remove all of the potential black jurors, resulting in an all-white jury, which the Court found to be "suspicious" and therefore constituted a prima facie showing of an inference of discrimination against a black defendant in a case with a white victim. *Johnson*, 545 U.S. at 164-73. Similarly, in *Snyder*, the State also struck all of the black potential jurors from the jury, although the court ultimately found discriminatory intent based on the State's specific race-neutral reasons for striking a specific black juror.

In contrast to *Johnson* and *Batson*, the facts here do not support an inference of racial discrimination, but rather align with the *Draughn* case. Presented with a situation similar to the instant case, the Louisiana Supreme Court in *Draughn* considered "several relevant circumstances which negated a finding of discriminatory intent" and upheld the trial court's determination that the defendant failed to make a prima facie case of racial discrimination. 2005-1825, pp. 26-30, 950 So.2d at 603-05. The Court explained,

> Although a trial judge does not make a determination of the credibility and persuasiveness of the prosecutor's stated race-neutral reasons until the third and final step of a *Batson* analysis, which was not reached in the case here, we nevertheless gain comfort in the appropriateness of our decision by our review of the type of factors which would support the ultimate finding of purposeful discrimination denounced in *Miller-El*[, 545 U.S. 231, 125 S.Ct. 2317].

*Id*., p. 28, 950 So.2d at 604-05.

The *Draughn* Court considered the following factors which negated any potential inference of discrimination: (1) "the nature of the case itself presented no overt racial overtones" because the defendant and the victim were the same race; (2) though legally timely, the defendant failed to raise his objection until the State

14

had exercised all of its peremptory challenges, and after all jury panels had been exhausted, notwithstanding that the State had struck several black jury veniremen throughout the course of voir dire; (3) the record did not indicate that any particular jurors had been "targeted" for more questioning "to provoke a certain response"; (4) the single black juror's vote could not be negated due to the "unanimity requirement" for capital convictions and sentencing; (5) the State declined to utilize all of its peremptory strikes during jury selection; and (6) the trial court did not waiver in its finding, unlike in *Johnson*, where the trial judge indicated the case was "very close." 2005-1825, pp. 26-28, 950 So.2d at 603-04.

When we apply the *Draughn* principles to the instant matter, we reach the same result. With the exception of the *Batson* challenge, this case presented no evidence of any overt racial tones, either substantively or procedurally. First, the victim and Mr. Boys are black males. Additionally, Mr. Boys was not subject to an all-white jury and the votes of the seated black jurors could not be entirely negated given that the verdict was unanimous. Nor does the record indicate that the State targeted any particular jurors for more questions or to provoke a certain response. Furthermore, the State did not exhaust all of its available peremptory strikes, and the trial court unequivocally found that Mr. Boys had not made a prima facie case of racial discrimination.

The circumstances in which courts have found a prima facie case of discrimination are not present here. The mere fact that the State used the majority of its strikes against black jurors does not establish a prima facie case of discrimination. *See, e.g., Williams*, 13-0283, pp. 16-17, 199 So.3d at 1232-33. As the Louisiana Supreme Court held in *State v. Dorsey*, 10-0216, p. 15 (La. 9/7/11),

74 So.3d 603, 617, a "defendant's reliance upon statistics alone does not support a prima facie case of race discrimination."

Similar to the Supreme Court's finding in *Draughn*, here, Mr. Boys failed to present evidence sufficient to infer that the State struck jurors with a discriminatory intent. Accordingly, the trial court's judgment denying Defendant's *Batson* challenge was not manifestly erroneous. *See State v. Broussard*, 16-1836, p. 7 (La. 1/30/18), ---- So.3d ----, ----, 2018 WL 618741 at *5 ("a trial court's determination as to purposeful discrimination rests largely on credibility evaluations and is therefore entitled to great deference.").

We find no merit to this assignment of error.

**ASSIGNMENT OF ERROR NO. 2**

Mr. Boys' second assignment of error argues that the State's use of "racially inflammatory language and themes" deprived him of a fair trial. Specifically, Mr. Boys alleges the State made impermissible racial and ethnic generalizations in the following manner: (1) the State's reference to Mr. Boys as "this little savage" in closing argument; and (2) and Dr. Salcedo's testimony contrasting "street smarts" versus "book smarts" and "social cultural factors" in assessing and adjusting the IQ test scores of African-Americans, promoting a racially-charged depiction of Mr. Boys as a street-smart drug-dealer.[13]

The State used the term "savage" in closing argument when it argued "[t]hat the last thing that [Officer Holloway] sees before he is killed is this little coward, this little savage, crawl through that window gun first." Mr. Boys maintains that use of the term "savage"' as a reference to a black man has no place in American

---

[13] Further reference to the State's closing argument that Mr. Boys may have been a drug dealer is discussed in assignment of error no. 6.

parlance. Arguing that the term cannot be cured by instruction, Mr. Boys maintains its very usage warrants reversal. The State counters that it did not use the term "savage" in a racial context. Instead, the term was used in the context of describing the heinous nature of the crime and Mr. Boys' abhorrent conduct.

As to Mr. Boys' argument that Dr. Salcedo's testimony regarding "book-smarts" versus "street smarts" and cultural competency improperly implied that IQ scores may be adjusted on the basis of race, the State notes that Dr. Salcedo's testimony on these issues resulted from the defense's cross-examination of Dr. Salcedo. Our review of the trial transcript confirms that, during cross-examination, defense counsel specifically asked Dr. Salcedo to explain the term "street-smarts" and the concept of cultural competency. Mr. Boys cites no testimony, other than cross-examination, when those terms were otherwise used. Accordingly, we agree with the State that Mr. Boys cannot impute prejudicial conduct to the State for testimony elicited by the defense.

Moreover, although we do not find the language used by the prosecutor or State witnesses was so inflammatory as to have contributed to the jury's verdict, we need not reach this issue. Under La. C.Cr.P. art. 841(A), an "irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." The record reflects that no contemporaneous objection was made to the use of the term "savage" or to Dr. Salcedo's testimony. That notwithstanding, even if this Court fully reviewed the merits of this assignment of error, considering the overwhelming evidence presented by the State of Mr. Boys' guilt, as will be discussed more fully herein, Mr. Boys failed to show that the State's use of this alleged inflammatory language or themes adversely influenced the jury's verdict so

as to warrant a reversal. [14]  *See State v. Henry*, 13-0059, p. 29 (La. App. 4 Cir. 8/6/14), 147 So.3d 1143, 1160.

We find no merit to this assigned error.

## ASSIGNMENT OF ERROR NOS. 3 AND 4

Mr. Boys' third and fourth assignments of error contend, respectively, that the State improperly utilized other crimes evidence and that the trial court erroneously issued an "other crimes" evidence instruction to the jury.

Prior to trial, on June 29, 2017, the State filed notice of its intent to introduce other crimes evidence, which the trial court granted the motion on July 14, 2017. The State supplemented its *Prieur*[15] notice on October 16, 2017, and the trial court granted the motion to introduce additional evidence two days later, just before his first trial began.

La. C.E. art. 404(B)(1) provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an

---

[14]  We also note that Mr. Boys' claim that Dr. Salcedo "also endorsed the adjustment of [IQ] scores of African Americans based on 'sociocultural factors,'" was not trial testimony. In his brief, Mr. Boys concedes that this testimony came from the transcript of the Competency I Hearing held on September 21, 2017. Moreover, the complained-of testimony from the Competency I hearing was elicited by defense counsel during counsel's direct examination of Dr. Salcedo. Clearly, inasmuch as the trial jury did not hear this testimony, the testimony could not have impacted the jury's verdict.

[15] *State v. Prieur*, 277 So.2d 126, 130 (La. 1973), *abrogated on other grounds by State v. Taylor*, 2016-1124 (La. 12/1/16), 217 So.3d 283.

> integral part of the act or transaction that is the subject of the present proceeding.[16]

Notice is not required "as to evidence of offenses which are a part of the res gestae, or convictions used to impeach defendant's testimony." *Prieur*, 277 So.2d at 130.

### The State's Proof and Utilization of Other Crimes Evidence

The sub-parts of Mr. Boys' third assignment of error generally assert that the trial court erred in granting the State's other crimes evidence motion without supporting evidence and establishing relevancy. Mr. Boys further argues that the State exceeded the scope of the trial court's permitted use for such evidence.

In his first sub-part, Mr. Boys contends that the State's written notice of intent to introduce evidence of Mr. Boys' other crimes at trial was merely a boilerplate recitation of the code article, and therefore, the trial court erred in granting the State's non-specific motion without determining independent relevance at the *Prieur* notice hearing. A review of the record reflects that the State intended to introduce several of Mr. Boys' previous arrests into evidence for the purpose of proving "motive, opportunity, intent, knowledge, identity, and absence of mistake or accident as provided under La. CE 404(B)(1)." The State added that it did not seek to introduce "the particulars of the arrest, except as it relates to evidence of acts toward law enforcement and/or attempts to resist law enforcement and/or hide or deceive law enforcement." In support, the State attached Mr. Boys' police arrest records for each of the crimes to its motion. The other crimes evidence included: (1) resisting arrest and battery on a police officer; (2) unauthorized entry, disturbing the peace, and resisting arrest; (3) Mr. Boys'

---

[16] La. C.E. art. 412 refers only to sexual assault cases, and thus does not apply in this case.

arrest for unauthorized use of a motor vehicle, his related movement of his handcuffed hands to the front of his body and repeated threats to the arresting officer; (4) attempted simple escape; (5) Mr. Boys' denial of possession of contraband, although a search uncovered a lighter on his person; (6) Mr. Boys' fight with arresting officers during an arrest for second degree battery and cruelty to a juvenile; and (7) Mr. Boys' refusal to comply with an officer's orders during an arrest for disturbing the peace.[17]

In granting the State's other crimes evidence motion, the trial court ruled as follows:

> At this time, I find that the offenses that the State seeks to introduce in Mr. Boys' trial in chief are admissible and they do exhibit a pattern of conduct and are relevant based on the fact that they involve law enforcement during the course of his arrest for other offenses, exhibit the same pattern of conduct and pursuant to *Prieur* they exhibit evidence for the purpose of motive, opportunity, intent, knowledge, identity and absence of mistake or accident as to the actions that he chose to take during the course of his arrest previously for seven separate events of which police reports have been submitted by the State and I have had the opportunity to review them.
>
> I don't find that live testimony needs to be taken and I do find that there may be issues, obviously, in their admissibility as to the way in which the State seeks to introduce that evidence during the course of the trial, which, of course, we'll take up throughout the course of pretrial motions and motions in limine, but as far as the admissibility of these offenses themselves, I do find them to be admissible pursuant to *State v. Prieur*.

Mr. Boys re-urges in this appeal that the State's other crimes evidence did not prove any material fact at issue, was unsupported, and had no independent

---

[17] Prior to trial, the trial court granted the State's supplemental motion to add as other crimes evidence of an incident in which Mr. Boys was detained and fled from the officers while still handcuffed.

relevance, maintaining that the State's mere attachment of police reports to its motion, without live testimony, was insufficient to prove he committed the bad acts.

To admit other crimes evidence, the State is simply required to make a showing that sufficient evidence exists to support a finding that the defendant committed the other act. *See State v. Taylor*, 16-1124, pp. 11-12 (La. 12/1/16), 217 So.3d 283, 292. Dependent upon the facts of each case, a mini-trial of the prior offense may not be required to determine admissibility; instead, the introduction of other documents, such as a police report or conviction, may suffice. *Id.* In the present matter, the trial court found that live testimony was not necessary and likewise determined that the attached police reports sufficed to admit the State's other crimes offenses into evidence.

A trial court's ruling on the admissibility of other crimes evidence will not be disturbed absent an abuse of discretion. *State v. Galliano*, 02-2849, pp. 3-4 (La. 1/10/03), 839 So.2d 932, 934. The record shows that the State clearly listed its other crimes evidence, provided supporting documentation of the offenses, and specified the underlying purpose for the evidence's use. We thus find no abuse of the trial court's discretion in granting the State's other crimes motion. Mr. Boys' claim that the State's other crimes evidence motion lacked competent supporting evidence and proof of relevancy is without merit.

We now address the other sub-part of these assignments of error whereby Mr. Boys argues that the State exceeded the parameters set by the trial court to utilize other crimes evidence.

Mr. Boys re-urged his request to exclude the State's other crimes evidence after the defense conceded Mr. Boys' identity as the shooter. After that

concession, the trial court modified its order to preclude the State from using identity as an exception to the introduction of other crimes evidence. However, the trial court indicated that the State could use other crimes evidence for purposes of showing intent and state of mind arising out of Mr. Boys' interaction with law enforcement, stating:

> All right. I will note for the record that under the bases of 404(b) there are multiple factors to be considered. First, and one of the most glaring ones for this case, for purposes of this case, is state of mind and intent and I think clearly the prior allegations against Mr. Boys, including, but not limited to, his prior convictions for anything involving any entanglements with law enforcement goes toward his state of mind at the time in comparison to his state of mind in the instant offense and is relevant and more probative than it is prejudicial.

Mr. Boys cites several examples where he insists the State contravened the trial court's ruling and improperly elicited other crimes evidence testimony to prove the "truth" of his alleged general propensity for crime. These examples include: (1) Dr. Salcedo's testimony that Mr. Boys "fought with police in nine separate criminal cases," and started dealing cocaine in 1997; (2) Dr. Deland's cross-examination testimony regarding her review of certain police reports involving Mr. Boys' various law-enforcement encounters; (3) the State's cross-examination of Jernice Joseph, Mr. Boys' half-sister, in regards to Mr. Boys' arrest for cruelty to a juvenile and Ms. Joseph's specific knowledge of Mr. Boys' propensity to fight with police officers; (4) the State's rebuttal closing argument referencing Mr. Boys' going "through the criminal justice system"; and (5) the State's solicitation of testimony from Mr. Johnson, the former police officer, that Mr. Boys had six outstanding warrants.

After reviewing the record, we do not find that any of the testimony and evidence amounted to an improper utilization of the State's other crimes evidence.

As the trial court found, the State's other crimes evidence was admissible to show Mr. Boys' patterns of intent to escape from police custody and his willingness to use violence to that end juxtaposed against Mr. Boys' affirmative defense that a mental disease or defect prevented him from forming the specific intent to murder Officer Holloway, although the evidence in the instant matter showed he had concealed a firearm on his person and had attempted to escape custody. (*See Taylor*, 16-1124, p. 12, 217 So.3d at 292 (evidence offered for a purpose permitted by La. C.E. art. 404(B)(1) "is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense.")). Accordingly, any mention by the State or its witnesses referencing Mr. Boys' fighting with or fleeing from police officers during an arrest was not erroneously admitted.

With regard to Dr. Salcedo, Mr. Boys complains that the State inappropriately questioned Dr. Salcedo about Mr. Boys' criminal history when Dr. Salcedo had no first-hand knowledge of that history. In particular, Mr. Boys highlights that the State's re-direct examination of Dr. Salcedo included an allegation that Mr. Boys dealt cocaine in 1997, an offense that was not noticed in the State's list of other crimes evidence.

In evaluating this claim, we first note that Mr. Boys failed to object to this line of questioning at trial; hence, in accordance with La. C.Cr.P. art. 841(A), Mr. Boys failed to preserve this issue for appellate review. Even had Mr. Boys timely objected to this testimony, Mr. Boys' argument is meritless. The record shows that all of the mental health experts reviewed a compilation of Mr. Boys' medical records, some of which detailed Mr. Boys' criminal activities, in their evaluation of Mr. Boys. In this instance, the defense raised the issue of Mr. Boys' possible cocaine use and drug-dealing with its introduction of Dr. Ralph Chester's 1998

23

medical report, which included references to Mr. Boys' dealing cocaine in 1997. Moreover, defense counsel cross-examined Dr. Salcedo about Dr. Chester's report and Mr. Boys' juvenile arrest charge. Accordingly, Mr. Boys' cross-examination opened the door for the State to ask Dr. Salcedo additional questions on these topics. "Once the defense opens the door in cross-examination on a subject it becomes a proper subject for redirect. . . . The defense may not approach a prohibited area . . . and then close the door to clarification by the State." *See State v. Hugle*, 11-1121, p. 23 (La. App. 4 Cir. 11/7/12), 104 So.3d 598, 615 (quoting *State v. Stewart*, 483 So.2d 155, 157 (La. App. 4 Cir. 1986)); *see also* La. C.E. 611 (D)("[a] witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case.").

Therefore, the State's re-examination of Dr. Salcedo was not only permissible based on the scope of the defense's cross-examination and its introduction of Dr. Chester's report into evidence, but it also correlated with the State's permitted use of other crimes evidence. The State utilized Dr. Salcedo's re-direct examination to establish Mr. Boys' pattern of confrontation with arresting officers and misrepresentation of the nature of those confrontations in psychiatric evaluations. The testimony also bolstered the State's and Dr. Salcedo's position that Mr. Boys' ability to function as a drug dealer meant that he did not have a debilitating mental defect, and a 2014 psychotic episode Mr. Boys suffered was related to substance abuse.[18]

---

[18] The State's re-examination of Dr. Salcedo encompassed the following:

State: [Defense Counsel] brought up the report of Ralph Chester, correct?

Similarly, Mr. Boys opened the door for the State to cross-examine Dr. Deland as to whether she had reviewed the State's "other crimes" Jefferson Parish police reports. On direct examination, Dr. Deland identified all the reports she relied upon in formulating her opinion that Mr. Boys had a mental defect, including the police report involving his 2014 hospitalization. On cross-examination, Dr. Deland indicated that she had not reviewed Mr. Boys' Jefferson Parish arrest records. Dr. Deland acknowledged that more information could likely render a more informed opinion. Hence, the State's cross-examination was permissible to support its argument that Dr. Deland's opinion that Mr. Boys had a mental defect was based on incomplete information. As such, the State's questioning of Dr. Deland fell within the scope of permissible cross-examination and, as a result, did not violate any evidentiary rules.

The record also belies Mr. Boys' argument that the State improperly extracted other crimes evidence in its cross-examination of Ms. Joseph about Mr. Boys' criminal history. As with Dr. Salcedo and Dr. Deland, Mr. Boys opened the door to this cross-examination with Ms. Joseph's direct testimony that suggested

---

Dr. Salcedo: Correct.

State: In that report [Mr. Boys] is reported, and this was in 1998, he was reported to have said that the police are trying to say he fought with them instead of passively letting them arrest him, correct?

Dr. Salcedo: Correct.

The State then pointed out that Mr. Boys' arrest records contradicted that claim, and continued:

State: And in regards to his statement on the second page that [Mr. Boys] started dealing cocaine possibly as early as spring of 1997 as he, quote, wanted to make some money and get nice clothes, he indicated he could make between $100 and $200 per day and denying that he has ever used any drugs or alcohol himself. Dr. Salcedo, upon your review of the records, going from 1998 until present or until [Mr. Boys] was arrested, is there an indication of substance abuse?

that Mr. Boys' criminal history was evidence of his mental defect. Ms. Joseph testified on direct examination that Mr. Boys was frequently in and out of jail, referenced Mr. Boys' arrest for cruelty to a juvenile, and attested that Mr. Boys frequently "clicked out" and did not remember his criminal behavior because of his mental state. Thus, the State was entitled to cross-examine Ms. Joseph about Mr. Boys' cruelty to a juvenile arrest and her awareness, if any, that Mr. Boys had fought with police upon that arrest. Although Mr. Boys contends the cross-examination was improper because Ms. Joseph was not present at the time of the actual arrest, we find the cross-examination permissible in light of Ms. Joseph's extensive direct testimony concerning Mr. Boys' life of crime.

Mr. Boys' claim that the State improperly commented on his interaction with the criminal justice system in rebuttal argument is likewise unsupported by the record. The State has wide latitude in closing argument. *Henry*, 13-0059, p. 29, 147 So.3d at1160 (citing *State v. Manning,* 03-982, p. 75 (La. 10/19/04), 885 So.2d 1044, 1108)). "Nevertheless, even where a prosecutor exceeds that wide latitude, the reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the guilty verdict." *Id.* (citation omitted). As previously noted, Mr. Boys' sister, Ms. Joseph, testified on direct examination about Mr. Boys' life of crime, and Mr. Boys introduced into evidence medical records citing his criminal activities. Accordingly, the State's general reference to Mr. Boys' extensive criminal history did not exceed its wide latitude for closing argument. The defense had already presented the jury with this information during trial.

Mr. Boys' final argument concerning other crimes evidence is that the State improperly introduced other crimes evidence testimony through Mr. Johnson, the

former police officer.  Mr. Johnson testified that completion of paperwork required him to address Mr. Boys' six outstanding warrants.  The State counters that it did not directly ask Mr. Johnson about these warrants.

"When a witness refers directly or indirectly to another crime committed or alleged to have been committed by the defendant, as to which evidence is not admissible, the defendant's remedy is a request for an admonition or a mistrial pursuant to LSA-C.Cr.P. art. 771." *State v. Prater*, 99-0900, p. 7 (La. App. 4 Cir. 4/26/00), 762 So.2d 82, 87.  Here, at Mr. Boys' request, the trial court gave a limiting instruction to disregard Mr. Johnson's comments.  Mr. Boys did not request any other relief.  Because the trial court ruled in Mr. Boys' favor on this, there is no adverse ruling before this Court that requires review.  This assignment of error is without merit.

We now review Mr. Boys' fourth assignment of error.

### *Other Crimes Jury Instruction*

Mr. Boys' fourth argument relates to his claim that the trial court's jury instruction on other crimes evidence was improper because the State never provided competent evidence that he had actually committed any of the offenses. Mr. Boys maintains the instruction improperly "invited" the jury to consider other crimes evidence as substantive evidence of his guilt.  However, having already determined that the trial court properly found that the State's introduction of police reports satisfied the State's burden of proof to admit other crimes offenses in to evidence, this Court need only review the validity of the instruction.

The trial court's other crimes evidence jury instruction provided:

> Evidence that the defendant was involved in an offense
> other than the offense for which he is on trial is to be
> considered only for a limited purpose. The sole purpose

27

> for [sic] such evidence may be considered is whether it tends to establish proof of a motive, opportunity, intent, preparation, a system or plan, knowledge, identity, absence of mistake or accident. Remember, the accused is on trial only for the offense charged. You may not find him guilty of this offense merely because he may have committed another offense.

This instruction properly informed the jury that it could not find Mr. Boys guilty merely because he may have committed another offense; consequently, we find no error in the trial court's other crimes evidence jury instruction.

Although we have found no error in the trial court's admission of other crimes evidence in this case, we note that our jurisprudence indicates that the introduction of otherwise inadmissible other crimes evidence is subject to a harmless error analysis. *See State v. Johnson*, 94-1379, p.17 (La. 11/27/95), 664 So.2d 94, 102. Erroneous admission of other crimes evidence is harmless unless a reviewing court is "thoroughly convinced that the remarks inflamed the jury and contributed to the verdict." *Prater*, 99-0900, p. 8, 762 So.2d at 88 (quoting *State v. Nicholson*, 1996-2110, p. 13 (La. App. 4 Cir. 11/26/97), 703 So.2d 173, 180)).

In the instant matter, the record does not substantiate Mr. Boys' contention that any of the aforementioned errors inflamed the jury and contributed to the verdict. Given the overwhelming evidence of Mr. Boys' guilt presented at trial, including the video evidence of the crime as it was committed, we are not "thoroughly convinced" that any of the other crimes evidence contributed to the verdict. Accordingly, we find that all of Mr. Boys' assignments of error relative to the introduction of other crimes evidence are without merit.

**ASSIGNMENT OF ERROR NO. 5**

Mr. Boys' fifth assignment of error asserts that the State undermined his Sixth Amendment right to counsel by the State's alleged attack on defense

counsel's ethics, essentially accusing defense counsel of "fraud, incompetence and obfuscation." Mr. Boys specifically complains that the State's disparaging comments impaired defense counsel's ability to function as his attorney in that the State: (1) suggested that defense counsel unethically obtained medical records of Mr. Boys' deceased family members; (2) introduced jailhouse phone calls in which Mr. Boys criticized his counsel's representation; and (3) made rebuttal arguments that claimed defense counsel was disingenuous and insensitive for attempting to empathize with Officer Holloway's family and asking the family to stand.

Disparaging remarks or intemperate criticism of defense counsel may constitute reversible error when such remarks adversely influence and prejudice a jury against a defendant. *State v. Berniard*, 14-0341, p. 16 (La. App. 4 Cir. 3/4/15), 163 So.3d 71, 83. However, to amount to reversible error, the effect of the improper remarks must have contributed to the verdict, thereby denying defendant a fair trial. Upon our review of these alleged disparaging comments, we find no merit to this assigned error.

Mr. Boys alleges the State questioned his sister, Ms. Joseph, in a manner that suggested the defense had acted unethically in obtaining the medical records of their mother and uncle. He points out that, while outside the presence of the jury, the trial court had ruled those medical records admissible, overruling the State's objection that Mr. Boys had not met the legal requirements to obtain medical records for deceased family members. Mr. Boys complains that the State nevertheless pursued a line of questioning of Ms. Joseph to suggest that the medical records indeed had been improperly obtained.

The State's cross-examination established that Mr. Boys did not have power of attorney; that Ms. Joseph would not have allowed Mr. Boys access to the

records; and questioned Ms. Joseph as to her awareness that Mr. Boys had signed a release to obtain the records before their mother's death. Pursuant to that questioning, defense counsel objected, and argued, "[H]ow I obtained, legitimately obtained, the records from my client is totally spurious. She is trying to impeach me in front of the Jury, not the witness." After the trial court had instructed the State to move on, the State again asked Ms. Joseph if she knew that Mr. Boys had requested their mother's medical records. When counsel for Mr. Boys objected, the State responded, "I don't know why Mr. Sothern doesn't want the answer on the record." Defense counsel then stated, "I know why she is doing this, she is trying to defame me." The trial court ultimately declared that, "[a]ny objections that are lodged are to be made on the basis for your legal objection and not a running narrative of why you are offended by the question, please."

After reviewing the record on these issues, we agree with the State that to the extent that any inference was drawn that defense counsel had inappropriately obtained the medical records, it was the defense's narrative objections that created the inference. The State did not mention defense counsel in its cross-examination of Ms. Joseph. But for defense counsel's own outbursts, the State's line of questioning was not accusatory toward defense counsel. Accordingly, we find that the State's cross-examination of Ms. Joseph regarding their mother's medical records did not amount to disparaging remarks.[19]

Similarly, Mr. Boys has not demonstrated the State's introduction of jailhouse phone calls was for the purpose of embarrassing or disparaging defense

---

[19] Mr. Boys asserts that the trial court failed to admonish the State; however, our review of the record does not show that an admonishment was requested. In the event Mr. Boys requested an admonishment that was improperly denied, as discussed, *infra*, the denial would amount to harmless error in light of our finding that the State's cross-examination of Ms. Joseph regarding the medical records did not constitute denigration of defense counsel.

counsel.  Mr. Boys maintains the jailhouse telephone calls included discussions of his dissatisfaction with defense counsel, allegations that counsel had not been forthright with him and his wife, and complaints that counsel had not followed through with some of Mr. Boys' requests.  However, the State represents that it introduced the jailhouse telephone calls to rebut Mr. Boys' mental defect claim. The State maintains that the telephone calls reflected that Mr. Boys was capable of recalling basic information, was involved in his trial strategy, and had a language aptitude that exceeded his reported IQ.  Moreover, the record shows that Dr. Salcedo cited the jailhouse telephone calls in formulating his opinion that Defendant's "language, the expression, the abstraction, the prayer, are all inconsistent with an IQ of 59."

Based on Mr. Boys' plea of not guilty and not guilty by reason of insanity, his mental capacity was clearly at issue in this trial.  Pursuant to La. C.E. art. 403, the jailhouse telephone calls were relevant and hence, admissible.[20]  The probative value of the calls outweighed any possible prejudice to Mr. Boys caused by Mr. Boys' own statements about his attorney.  As such, the trial court was not required to exclude or redact the calls to eliminate any mention of defense counsel. Therefore, the State's introduction of the jailhouse phone calls was for a lawful purpose and was not an improper attack on defense counsel.

Mr. Boys also claims the State's comment that defense counsel had been disingenuous in closing argument when he stated that he personally understood the

---

[20] La. C.E. art. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.

31

anxiety of losing a loved one and the State's request to have Officer Holloway's family stand amounted to a personalized attack on defense counsel. While the State has wide latitude in making closing arguments, it should not appeal to prejudice or make personal attacks on defense strategy and counsel. *Henry*, 13-0059, p. 29, 147 So.3d at 1160 (citing *Manning,* 2003-1982, p. 75, 885 So.2d at 1108). "Nevertheless, even where a prosecutor exceeds that wide latitude, the reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the guilty verdict." *Id*. (citation omitted).

We note, too, that a trial court is afforded broad discretion in controlling the scope of closing arguments, and Louisiana courts have consistently recognized that credit "should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence, heard the arguments, and repeatedly been instructed by the trial judge that arguments of counsel are not evidence." *State v. Lawrence*, 12-1026, p. 6 (La. App. 4 Cir. 7/3/13), 120 So.3d 812, 817 (citing *State v. Casey*, 99-0023, p. 17 (La. 1/26/00), 775 So.2d 1022, 1036; *State v. Mitchell*, 94-2078, p. 11 (La. 5/21/96), 674 So.2d 250, 258)).

Here, the State's rebuttal argument and its request for the family to stand were clearly intended to rebuff Mr. Boys' efforts to empathize with Officer Holloway's family and thus, were within the latitude allowed for closing argument.[21]  Even if these comments or actions were improper, Mr. Boys offered no evidence or convincing argument that the State's rebuttal argument improperly influenced the jury.  Accordingly, this alleged error is meritless.

---

[21] The trial court overruled Mr. Boys' objection to the State's request to have Mr. Holloway's family stand up.

**ASSIGNMENT OF ERROR NO. 6**

In addition to those arguments made by Mr. Boys regarding allegedly improper statements made by the State, in his sixth assignment of error, Mr. Boys contends that the State made improper remarks during its closing argument. This assignment of error includes those comments we previously addressed as to the State's reference to Mr. Boys as "this little savage"; the allegedly improper denigration of defense counsel; and the State's request to have Officer Holloway's family stand. We have already addressed these allegedly improper statements made during closing argument, raised in the context of other assignments of error. We thus need only address Mr. Boys' remaining issues regarding improper closing argument, which include the claims that the State made improper emotional appeals "to the jurors to valorize the victim," Officer Holloway, and made unsupported allegations that Mr. Boys sold "Norco," improperly suggesting that Mr. Boys was a drug dealer.

Argument of counsel during the course of a trial is governed by La. C.Cr.P. art. 774, which provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
>
> The argument shall not appeal to prejudice.
>
> The State's rebuttal shall be confined to answering the argument of the defendant.

*See also State v. Casey*, 99-0023, p. 17 (La. 1/26/00), 775 So.2d 1022, 1036.

As to the alleged improper "valorization" of Officer Holloway, Mr. Boys claims the State appealed to jurors' emotions and prejudice in its description of him as "a 20-year veteran, who served our city . . . [and] dedicated his life to

33

keeping us safe" and in declaring that "[t]he last breath of Officer Holloway was to save you." Mr. Boys maintains these emotional appeals to the jurors "improperly placed them in a symbolic role representing the community."

With reference to the "drug-dealing" inflammatory allegation, the State acknowledges it suggested Mr. Boys had sold Norco in its rebuttal.[22] The State explains, however, that it made the rebuttal argument, not out of racial animus, but rather to counteract the defense's closing argument that Mr. Boys had used Norco to self-medicate his alleged mental illness.

A review of the record reflects that Mr. Boys failed to object to the State's characterization of Officer Holloway and also failed to object to the State's suggestion that Mr. Boys likely sold some of his prescription medication during the State's rebuttal argument. Thus, those issues are not preserved for review. *See* La. C.Cr.P. art. 841(A). Nonetheless, even were this Court to consider those arguments, we find them unpersuasive in light of the wide latitude afforded closing arguments, Mr. Boys' failure to show that these errors contributed to the verdict, and the trial court's jury instruction on argument of counsel. The trial court instructed the jury as follows:

> As jurors, you are not to be influenced by mere sympathy, passion, prejudice or public opinion . . . . Statements made by the attorneys at any time during the trial are not evidence. In the opening statements the attorneys were permitted to tell you the facts they expected to prove. In closing arguments the attorneys were permitted to present, for your consideration, their contentions regarding what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence. The opening statements and closing arguments are not to be considered as evidence.

---

[22] "Norco" appears to be a reference to a prescription pain killer.

As to the propriety of the State's closing argument about Officer Holloway's valor, this Court takes judicial notice that the special duty imposed on police officers to serve and protect is common knowledge to all citizens. This special duty is underscored by the proscribed sentence of death or life imprisonment for the intentional killing of a peace officer as outlined in La. R.S. 14:30(A)(2), which defines first degree murder as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm upon a . . . peace officer . . . or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee." Additionally, in this particular case, Officer Holloway's duties and employment as a police officer were relevant to the charge of first degree murder. In accordance with La. R.S. 14:30, the trial court provided the following jury instruction defining first degree murder:

> The [definition on] which the State is relying in this case is as follows: First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer or civilian employee of the Louisiana State police crime laboratory . . . engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to Officer Holloway's status as a fireman, peace officer, or civilian employee.

Accordingly, we reject Mr. Boys' claim that the State's closing comments regarding Officer Holloway impermissibly inflamed the jury.

Likewise, the State's suggestion that Mr. Mr. Boys was a drug dealer did not unduly prejudice the jury. As referenced, the jury had already been exposed to Mr. Boys' criminal history and drug use through medical records and testimony the defense introduced into evidence.

Based on the foregoing, we find no merit to Mr. Boys' claims that the State's closing arguments were improper and deprived him of a fair trial.

**ASSIGNMENTS OF ERROR NOS. 7-11**

Collectively, these assignments of error arise out of Mr. Boys' contentions that he was not competent to stand trial and that a mental defect or disease relieved him of any responsibility for the murder of Officer Holloway. These errors can be separated into three categories: the evidence at the competency hearings showed Mr. Boys was incompetent to assist in his defense; the testimonies of Dr. Salcedo and Dr. Richoux were improperly admitted into evidence; and the trial court improperly excluded evidence of Mr. Boys' mental illness.

"Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La. C.Cr.P. art. 641. A defendant cannot stand trial if the trial court finds him mentally incompetent. *State v. Gibson*, 08-0741, p. 5 (La. 11/10/08), 993 So.2d 1193, 1196.

The issue of a defendant's competency may be raised at any time by either party or the court, and the proceedings against a defendant shall halt until defendant is found competent to proceed. La. C.Cr.P. art. 642. If the court has reasonable grounds to doubt defendant's mental capacity, it shall order a mental examination and appoint counsel, unless defendant is already represented. La. C.Cr.P. art. 643. The members of the sanity commission appointed to evaluate a defendant's mental capacity shall determine from their examination whether the

defendant has the capacity to understand the proceedings against him and whether

he is able to assist in his defense. La. C.Cr.P. arts. 644-45.[23]

In *State v. Bennett*, 345 So.2d 1129, 1138 (La. 1977), the Supreme Court set

out the relevant considerations for determining competency as follows:

> Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of

---

[23] La. C.Cr.P. art. 644(A) states, in relevant part:

> Within seven days after a mental examination is ordered, the court shall appoint a sanity commission to examine and report upon the mental condition of the defendant. The sanity commission shall consist of at least two and not more than three members who are licensed to practice medicine in Louisiana, who have been in the actual practice of medicine for not less than three consecutive years immediately preceding the appointment, and who are qualified by training or experience in forensic evaluations.

La. C.Cr.P. art. 645 provides, in part:

> A. (1) The report of the sanity commission members shall address their specific findings with regard to all of the following:
>
> (a) The defendant's capacity to understand the proceedings against him.
>
> (b) His ability to assist in his defense.
>
> (c) His need for inpatient hospitalization in the event he is found incompetent.

testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.

The findings of the sanity commission may be introduced as evidence at the competency hearing, along with evidence or reports from any independent mental examination defendant or the state may have conducted, and the court shall determine by a preponderance of the evidence whether defendant has the capacity to proceed. La. C.Cr.P. arts. 646-48.[24] Whether reasonable grounds to doubt a defendant's mental capacity exist, and whether to order a mental examination falls within the sound discretion of the district court, and its determination will not be set aside absent a clear abuse of discretion. *State v. German*, 12-1293, p. 19 (La. App. 4 Cir. 1/22/14), 133 So.3d 179, 194 (citing *State v. Bickham*, 404 So.2d 929, 934 (La. 1981); *State v. Gauthier*, 07-0743, p. 10 (La. App. 4 Cir. 3/12/08), 978 So.2d 1161, 1168. Louisiana law "also imposes a legal presumption that a defendant is sane and competent to proceed" as per La. R.S. 15:423; thus, the "defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial." *State v. Anderson*, 06-2987, pp. 20-21 (La. 9/9/08), 996 So.2d 973, 992 (citing *State v. Frank*, 96-1136, p. 1 (La. 10/4/96), 679 So.2d 1365, 1366)).

Before addressing the individual assignments of error, we first set forth the following testimony that was elicited at trial regarding Mr. Boys' mental and intellectual capacities.

---

[24] The legislature amended the burden of proof required to prove competency in La. C.Cr.P. art. 648 in Acts 2008, No. 861, § 1, eff. July 9, 2008 to comport with the U.S. Supreme Court's holding in *Cooper v. Oklahoma,* 517 U.S. 348 (1996). In *Cooper v. Oklahoma*, the Court rejected a clear and convincing standard in favor of a preponderance of the evidence standard in determining competency to stand trial.

Jernice Joseph, Mr. Boys' sister, testified that their mother was a paranoid schizophrenic, had suffered nervous breakdowns, and had been admitted to several mental hospitals.[25] Ms. Joseph said she and her siblings routinely suffered physical or mental abuse by other family members and that an uncle had sexually abused Mr. Boys when he was only five years old. [26]

Ms. Joseph testified that Mr. Boys "didn't do school," likely could not read or do math, and did not have a strong work history. Ms. Joseph described an occasion in which Mr. Boys jumped from a second-story window after he had told his wife that someone was after him. She also claimed Mr. Boys did not remember an incident when he had badly beaten his nephew. She referenced that incident as another occasion when Mr. Boys had "clicked out." She explained that Mr. Boys "lived a life of crime" but always denied his involvement when confronted "as if there was a third person involved, like there was somebody else inside of him or something."

On cross-examination, Ms. Joseph testified that although she considered Mr. Boys incapable of remembering basic information, like phone numbers, he had been able to remember her number because he had called her from jail. She also acknowledged that Mr. Boys had held only two jobs because he had been incarcerated for most of his life. Ms. Joseph said she had not been present when Mr. Boys was arrested for badly beating his nephew and did not know any of the details surrounding the arrest.

---

[25] Ms. Joseph testified that her mother had passed away several years earlier.

[26] Ms. Joseph also noted that a cousin suffered with bi-polar disorder, depression, and had committed suicide.

Dr. Deland, Mr. Boys' expert, testified that she reviewed numerous sets of medical records on Mr. Boys and certain family members, police reports, and video footage of Mr. Boys in conjunction with this case. Dr. Deland stated that a report from a juvenile court-ordered psychiatric evaluation performed on Mr. Boys when he was fifteen years old indicated that he had a performance IQ of seventy-three and an overall IQ score of sixty-two. She explained that at the time of the examination, an IQ score of sixty-two indicated "mild mental retardation," however, a performance IQ score of seventy-three indicated that Mr. Boys could be "functioning in the borderline intellectual range."

Dr. Deland noted that Mr. Boys' medical records from 2014 revealed that he had been hospitalized after he jumped from a window and broke his ankle. In addition to physical injuries, Dr. Deland asserted the 2014 medical records showed Mr. Boys was diagnosed with "a psychotic disorder" and an anxiety disorder, diagnoses premised in part on information provided by Mr. Boys' wife and post-traumatic stress arising out of a previous gunshot wound.[27]

Dr. Deland pointed out that the records from ELMHS, where Mr. Boys had been admitted subsequent to the Competency II Hearing, showed he was diagnosed with an unspecified psychotic disorder and had been prescribed anti-psychotic medication. Dr. Deland noted she first evaluated Mr. Boys after the fecal incident.

---

[27] A toxicology test yielded negative results for alcohol and several common illegal narcotics. However, Mr. Boys' wife told the attending psychiatrist that Mr. Boys was a "daily alcohol drinker," which prompted concern that Mr. Boys' agitation may be due to alcohol withdrawal. Dr. Deland testified as follows:

> [u]ltimately, the psychiatrist did not diagnose him with alcohol withdrawal delirium, although that was a consideration. He did not have the typical fluctuation of vital signs that we see with alcohol withdrawal, but that was a consideration, but the end diagnosis was acute psychosis and alcohol dependence from the psychiatrist.

40

At that first meeting, she said that Mr. Boys reported hearing voices and acting "scattered," which Dr. Deland described as "psychotic symptoms." At their next meeting, prior to the present trial, Dr. Deland reported that Mr. Boys appeared less distressed and spoke with more clarity. However, she averred that he still reported hearing voices despite taking his prescribed medication. Dr. Deland stated that because Mr. Boys appeared to be responding to the anti-psychotic medication, it was "more likely than not" that he suffered from an actual psychotic disorder.[28] Based on all of Mr. Boys' medical records and her meetings with him, Dr. Deland concluded that he suffered from a mental impairment, opining as follows:

> I do believe that [Mr. Boys] has some type of psychotic disorder. Based upon the description in the records and my observations, we have sort of what we call an unspecified schizophrenia spectrum, which basically means there [are] some symptoms that suggest schizophrenia, but I can't really specifically diagnose that. So I would place him somewhere in that psychotic disorder range, but I really—I can't be more specific than that. He gave me limited information and it is complicated by other factors that could also cause psychotic symptoms. So I have a hard time pinning that down and calling it schizophrenia . . . . I think it is actually supposed to be called unspecified schizophrenic spectrum disorder.

On cross-examination, Dr. Deland testified that Mr. Boys had been diagnosed as a youth with "oppositional defiant disorder" because he did not like to follow rules and regularly challenged authority figures. She also stated that although Mr. Boys suffered from some intellectual impairment, it was "not as severe as what we termed at the time 'mild mental retardation.'" Further, she verified that during Mr. Boys' hospitalization in 2014, his wife reported that he regularly consumed up to nine bottles of vodka per day, and at least one attending

---

[28] Additionally, Dr. Deland testified that the medication prescribed to Defendant was also used to treat disorderly behavior.

doctor theorized that Mr. Boys suffered from alcohol withdrawal complicated by lack of sleep. Dr. Deland also testified that although Mr. Boys had been prescribed anti-psychotic medication during his 2017 admission to ELMHS, the doctors expressed concern that Mr. Boys was malingering. Dr. Deland admitted that she had also suspected that Mr. Boys was malingering or "that he was exaggerating" his symptoms during their initial encounter.[29] Dr. Deland acknowledged the defense retained her to conduct an "evaluation to determine [Mr. Boys'] sanity at the time of the offense." Although Dr. Deland concluded that Mr. Boys suffered from a mental disease or defect, she testified that she could not render an opinion regarding his sanity at the time of the offense.

Dr. Rafael Salcedo, a recognized expert in forensic psychology,[30] evaluated Mr. Boys on behalf of the State to determine his sanity at the time of the offense. Dr. Salcedo testified that he was present in court for the entirety of Mr. Boys' case in chief, including during Dr. Deland's testimony.

Dr. Salcedo attributed Mr. Boys' verbal IQ score of fifty-seven—assessed when he was a juvenile—to his lack of schooling. He opined that Mr. Boys' overall IQ was likely similar to his performance IQ score of seventy-three. Dr. Salcedo further testified that the "diagnostic criteria for a diagnosis of intellectual disability requires the administration of an IQ test" and "a standardized measure of adaptive functioning" which he described as a measure of functional behavior that an IQ test lacks the capacity to measure. He explained that someone with a low IQ

---

[29] Dr. Deland explained that she thought Defendant might be malingering, in part, because he named incorrect colors of the American flag.

[30] Dr. Salcedo testified that he performs court-appointed "sanity commission evaluations" for Louisiana courts to determine competency to proceed to trial, as well as sanity at the time of the offense. He also wrote his doctoral dissertation on malingering.

score could nevertheless be functionally proficient in mechanical or other areas not necessarily measured by a standard IQ test.

Furthermore, Dr. Salcedo explained that IQ tests could be easily manipulated by someone who thinks he would benefit from being found intellectually disabled (by avoiding prosecution).

In Mr. Boys' case, Dr. Salcedo stated that his records did not show that an adaptive functioning assessment was done at the time of his juvenile IQ assessment. He explained that an adaptive functioning assessment was a necessary component to support an intellectual disability diagnosis. As such, Dr. Salcedo was also skeptical of a second IQ test performed by Dr. Joette James, where Mr. Boys' IQ score was fifty-nine. He explained that Dr. James' finding that Mr. Boys had "poor vocabulary use" and a "very weak memory" was offset by his jailhouse recordings which revealed Mr. Boys' use of words like "copacetic" and his boast that he was capable of reciting a long prayer from memory.

Dr. Salcedo also noted that Mr. Boys' actions at a Brother's Food Mart the day after Officer Holloway's murder suggested that he had a normal level of adaptive functioning.[31] Dr. Salcedo explained that Mr. Boys was able to conduct

---

[31] Dr. Salcedo referenced testimony from Lt. Kevin Burns, Jr. and NOPD Officer Dylan Warter regarding Mr. Boys' actions subsequent to the shooting, which established the following:

On the day after Officer Holloway's death, Mr. Boys was spotted at a Brother's Food Mart ("Brother's") in the Lower Ninth Ward. Lt. Kevin Burns, Jr., the lead investigator of the murder, testified that at the time of his apprehension, Mr. Boys had attempted to conceal his identity as the perpetrator by changing his clothes and shoes, removing the distinctive ring he had been wearing (which was visible in Officer Holloway's body camera footage) and hiding it in his sock, cutting the handcuffs, and wearing a hooded sweatshirt "in the middle of June."

NOPD Officer Dylan Warter was then dispatched to Brother's where he made eye-contact with a subject wearing "a gray winter zip-up jacket." Officer Warter testified that the subject immediately shielded his face, which made Officer Warter suspicious. Officer Warter located a photograph of Mr. Boys in the police database and observed a tattoo on his neck, identical to the one of the subject in the Brother's store. At trial, Officer Warter identified video surveillance footage from Brother's, which depicted Mr. Boys' actions.

the monetary transaction with the cashier. He also noted that Mr. Boys utilized evasive measures like turning his head away, lowering his hat, and walking in the opposite direction when he apparently realized that a policeman was in the store.

Dr. Salcedo testified that his insanity assessment encapsulates an individual's inability to understand right from wrong as a result of a mental disease or defect at the time of the offense. Dr. Salcedo explained that the term "mental disease" generally refers to major or severe psychotic disorders, like schizophrenia, or bipolar disorder with psychotic features, while the term "defect" generally refers to intellectual disability or "traumatic brain injury resulting in neurocognitive changes."

As to Mr. Boys, Dr. Salcedo testified that based on his September 15, 2017 and October 19, 2017 examinations, he found no evidence that Mr. Boys was suffering from a mental disease or defect. With respect to Mr. Boys' ability to understand right from wrong, Dr. Salcedo stated the following:

> It was apparent to me that the defendant in this case understood that a gun could kill somebody and he was using expressions such as "Don't kill yourself," and "let me go." "Don't kill yourself," to me, means that he understood that the actions that he was taking could result in the death of the person. That is a pretty clear indication of the person's ability to appreciate the wrongfulness of the conduct to the utmost degree.

Furthermore, Dr. Salcedo noted that Mr. Boys had a criminal motive for his actions, namely, to escape custody. Dr. Salcedo asserted that Mr. Boys' active efforts to avoid apprehension after the shooting indicated that he knew what he did

---

Officer Warter testified that Mr. Boys disregarded his command to stop, fled over a brick wall, jumped over several fences, and eventually boarded a RTA bus. After the bus's path was blocked, Mr. Boys immediately exited the bus and continued to flee before he was apprehended. When he was apprehended, he was still wearing handcuffs, although their center link had been cut.

was wrong, that he could get in trouble, and that he did not want to get caught. Dr. Salcedo testified that in his expert opinion, Mr. Boys was "not suffering from a psychiatric disorder which would have impaired his ability to distinguish right from wrong" at the time of the offense, and further, that Mr. Boys did, in fact, know right from wrong at the time of the offense.

On cross-examination, Dr. Salcedo agreed that ninety-seven percent of the population had an IQ score higher than Mr. Boys' performance IQ of seventy-three. He also stated that because the two components required to diagnose an intellectual disability are an IQ score below seventy and a low measure of adaptive functioning, adaptive functioning evaluations are not generally performed for those who fail to meet the first component. Dr. Salcedo reiterated that he disagreed with Dr. James' IQ findings because Mr. Boys' behavior, especially as indicated on the jailhouse phone calls, "was not consistent with someone with an IQ of fifty-nine."

Dr. Salcedo acknowledged that Mr. Boys was diagnosed with mild mental retardation with borderline intellectual potential and oppositional defiance disorder in 1997 following Mr. Boys' juvenile arrest for unauthorized use of a vehicle, illegal possession of stolen things, and possession of a controlled dangerous substance, Schedule II. He also acknowledged that Dr. Ralph Chester generated a 1998 psychoanalysis evaluation report following Mr. Boys' arrest for simple assault and simple criminal damage to property. Dr. Chester's report noted that Mr. Boys denied the criminal allegations, claimed the police assaulted him, and denied having any learning disabilities. The report determined that Mr. Boys had obvious intellectual limitations, and "function[ed] intellectually as if he ha[d] mild mental retardation." Dr. Salcedo pointed out that Dr. Chester did not conduct any independent testing and his diagnosis relied largely on prior IQ test results. Dr.

Salcedo re-emphasized that a diagnosis of mild mental retardation diagnosis or "mild intellectual retardation" could not be validated without a measure of adaptive functioning evaluation.

Dr. Salcedo disagreed that Mr. Boys' decision to have telephone conversations while in custody, notwithstanding his knowledge that they were recorded, was indicative of an intellectual disability. Similarly, Dr. Salcedo rejected the proposition that Mr. Boys' decision to wear a coat in the summer on the day of his apprehension evidenced a diminished capacity. To the contrary, Dr. Salcedo concluded that Mr. Boys conducted a cost-benefit analysis and decided to cover the handcuffs on his wrists, regardless of the attention the excessive clothing might attract.

Dr. Richard Richoux, an expert in forensic psychiatry, also reviewed Mr. Boys' medical records, heard the testimony of the trial witnesses, and examined the exhibits introduced by both parties. Dr. Richoux also testified that the psychiatrists who evaluated Mr. Boys at ELMHS expressed "a high degree of suspicion that [Mr. Boys] was feigning cognitive deficits and psychotic symptoms." Dr. Richoux opined that Mr. Boys had indeed suffered a psychotic episode in 2014 when he jumped from his window. However, he explained the episode was "related to toxic causes, and is not indicative of an ongoing mental illness, certainly not one that had anything to do with his actions on June 20th of 2015 when he killed Officer Holloway." Dr. Richoux expressed that Mr. Boys could have been suffering from withdrawal symptoms or suffering a psychotic response to a controlled substance that had metabolized by the time the urinalysis was administered.

46

Dr. Richoux pointed out that no evidence of psychosis had been documented prior or subsequent to the 2014 event. He explained that the diagnosis of "psychosis not otherwise specified" indicated that Mr. Boys exhibited psychotic symptoms at that specific time for unknown reasons. His review of the body camera footage from Mr. Boys' initial arrest following the domestic aggravated battery call revealed no apparent psychotic behavior. Based on his evaluation, Dr. Richoux concluded that Mr. Boys did not suffer from any mental disease or defect.

Dr. Richoux further testified that Mr. Boys was not insane at the time of the offense. Dr. Richoux noted that Mr. Boys' conscious decision to conceal the firearm in his waistband indicated that he knew his possession thereof "would be a major problem for him." Dr. Richoux agreed with Dr. Salcedo's analysis that Mr. Boys' actions and statements depicted in the video footage inside Officer Holloway's police vehicle revealed "someone who knows what he is doing and knows what he is doing is wrong. . . . He makes a fluid, goal-directed, organized, premeditated movement toward [Officer Holloway] and shoots him, then completes his plan of escape."

Dr. Richoux also observed that Mr. Boys did not appear psychotic or agitated in the surveillance footage taken from the food store prior to his arrest on murder charges. Instead, once Mr. Boys realized the police were inside the store, he became visibly nervous and made deliberate attempts to avoid being recognized. Dr. Richoux testified that he had seen "nothing to suggest at the time of this offense that [Mr. Boys] was incapable of distinguishing right from wrong."

On cross-examination, Dr. Richoux reiterated his hypothesis that Mr. Boys' psychotic behavior in 2014 could have been caused by toxic substances, such as ingesting synthetic marijuana or cocaine—the latter of which is notorious for

47

causing psychotic behavior. Dr. Richoux also noted that Mr. Boys was diagnosed with alcohol use disorder when he was discharged from the hospital in 2014 and that alcohol withdrawal symptoms could generally fall under the diagnosis of "psychosis not otherwise specified." Dr. Richoux admitted that he had not interviewed Mr. Boys as to "what he recalled about the offense itself." Dr. Richoux said an interview was unnecessary as he saw the actual events which captured Mr. Boys' behavior on video.

We now return to address the merits of Mr. Boys' assigned errors concerning his competency and evidence of a mental defect.

### *Competency Evidence*

In assigned error number 7, Mr. Boys re-urges that the trial court erred in finding him competent. This error requires our review of the competency hearings.

There were three competency hearings in this matter. The Competency Hearing I took place on September 21, 2017. The Competency Hearing II was conducted on October 19, 2017, and the Competency Hearing III occurred on November 30, 2017.

In the Competency Hearing I, Dr. Richoux and Dr. Salcedo testified that Mr. Boys' behavior and manner of expressing himself did not comport with someone functioning in the mild range of disability. They both opined that Mr. Boys was most likely a malingerer who engaged in symptom magnification, that he intentionally did not cooperate with the *Bennett* criteria assessment, and concluded he did not suffer from ongoing psychosis or any mental disease or defect that would render him unable to understand the charges against him or assist with his defense.

On the other hand, Mr. Boys' expert, Dr. McConville, found that Mr. Boys had an intellectual disability, had a sub-average IQ, and had suffered a psychotic episode in 2014. Although malingering was of some concern, Dr. McConville testified that Mr. Boys did not satisfy the *Bennett* criteria and concluded that Mr. Boys was incompetent.

The trial court agreed with Dr. Richoux's and Dr. Salcedo's assessment and determined that Mr. Boys was competent to stand trial.

At the Competency Hearing II, which was triggered by the fecal incident, the trial court considered testimony from Dr. Richoux and Dr. Salcedo, in addition to testimony from Mr. Boys' experts, Dr. McConville and Dr. DeLand, to determine the fecal incident's impact on Mr. Boys' competency. Drs. Salcedo and Richoux re-asserted that Mr. Boys was competent. Similarly, Dr. McConville maintained his position that Mr. Boys was incompetent. Nonetheless, he testified on cross-examination that he "didn't think that the feces incident had any bearing on [his] opinion about [Mr. Boys'] competency." Dr. Deland, whose initial examination of Mr. Boys occurred after the fecal incident, also opined that he was incompetent. At the close of the hearing, the trial court found Mr. Boys incompetent. The trial court reasoned:

> This is definitely an unusual situation. It's definitely the first time I've witnessed someone eating their own feces in open court. My biggest concern - and I feel that my obligation as the presiding Judge over this case, most importantly, is a respect for the proceedings and a respect for the record that's created each and every time that we come into this courtroom, and witnesses are sworn and victims' family members are present and defendants' family members are present.
>
> All of that encompasses a universal approach to creating a record. And my concern in this instance - and I believe my obligation - is to make sure the record is protected and this trial is only held once, and once alone, to save heartache on the basis of all parties involved. I don't want to have to go through this twice.

With that said, the issue of whether or not Mr. Boys is malingering and the unique timing by which Mr. Boys decided use this bag that was secreted on his body, and he had been walking around with it for six hours throughout the course of jury selection.

All those issues surround this field of malingering, where employees of Eastern Louisiana Mental Health System are experts in that field. They observe that on the hospital grounds. And we could definitively put to bed the issue of whether or not Mr. Boys is malingering.

In addition to that, this entire pool has been tainted by Mr. Boys' actions, and I don't find that anything that happens today, whether he's found competent or incompetent, will not be read by every single member of the jury pool that will be called for this case.

So, erring on the side of caution, I'm declaring Mr. Boys incompetent to proceed at this time, and Ordering that he be immediately remanded to Eastern Louisiana Mental Health System Forensic Division for competency restoration. I'm also Ordering, by this Court, that he be medicated - either voluntarily or involuntarily - based on the review by the doctors there, as to what they deem to be the medication required to get him restored to competency, as quickly and efficiently as possible, so that we can bring this case back to trial, at a setting when his competency is, in fact, restored. [32]

Mr. Boys takes the position that once the trial court found him incompetent at the Competency Hearing II, a legal presumption was created that he remained incompetent, thus the burden of proof shifted to the State to affirmatively prove his competency at the Competency Hearing III. Mr. Boys maintains that the trial court failed to shift the burden of proof to the State and instead, erroneously relied on the legal presumption of a defendant's competency in reaching its finding that he was competent to go to trial. However, Mr. Boys cites no legal authority that the competency burden of proof shifts upon a finding of incompetency, but generally

---

[32] The State filed an application for supervisory review with this Court to review the trial court's finding that Mr. Boys was incompetent, which was denied. *State v. Boys*, 17-0867 (La. App. 4 Cir. 10/20/17) (*unpub.*), *writ denied*, 17-1769 (La. 10/21/17), 228 So.3d 1221.

relies on *Cooper*.[33]  We find this reliance misplaced.  *Cooper* merely holds that a state may impose upon a defendant a presumption of competency, but cannot require a standard of proof beyond a preponderance of the evidence.  *Cooper* does not address any shifting of the burden of proof or vitiate the general presumption of a defendant's competency. Therefore, Mr. Boys retained the burden of proof to show by a preponderance of the evidence that he was incompetent to assist in his defense at the Competency Hearing III.  Based on the following testimony elicited at the Competency Hearing III, we find that he did not meet that burden of proof.

At the Competency Hearing III, Dr. Thompson, the Chief of Staff of ELMHS, testified that he personally evaluated Mr. Boys and observed several other psychiatric and psychological examinations. Dr. Thompson testified that Mr. Boys avoided answering questions throughout his evaluations. Dr. Thompson explained that Mr. Boys mostly refused to respond to the questions designed to evaluate his understanding of the legal system and his ability to assist with counsel (the *Bennett* criteria). Despite repeated attempts to encourage his participation in the tests and examinations, Mr. Boys continuously responded either "I don't know," or "I don't understand," or simply refused to acknowledge the examiner at all.  Dr. Thompson stated that on occasion, Mr. Boys provided incorrect answers that even someone with an intellectual disability should be able to answer. Dr. Thompson relayed that Mr. Boys "made clear in several different ways," that he did not want to participate in the process. Further, Dr. Thompson stated that Mr. Boys behaved completely differently in circumstances in which he knew he was

---

[33] *See* n. 24.

being evaluated and those where he knew he was not. Dr. Thompson observed that Mr. Boys asked for meals when he was hungry, inquired about the status of expected packages and mail, conversed normally on the telephone, and played chess with other patients in the unit. Dr. Thompson further testified that although Mr. Boys claimed to hear voices, "the voices really weren't that typical to me of someone with chronic mental illness or with schizophrenia." Mr. Boys was prescribed anti-psychotic medicine based on his self-reported symptoms, but repeatedly complained that the medication did not work and that he still heard voices.

Although Dr. Thompson could not "say with one hundred percent certainty" that Mr. Boys was "faking every symptom," he testified that after observing Mr. Boys' patterns and conducting the final competency evaluation, "we decided to return him to court and report that, you know, he wasn't participating in the evaluation fully, and malingering should be expected." Dr. Thompson and the other attending doctors rendered the following opinion in his final written report:

> We do not have definitive evidence of a mental illness or deficiency that would render Mr. Boys unable to understand the proceedings against him, or assist in his defense to a reasonable degree of rational understanding. There is also a high degree of suspicion that [defendant] may be feigning a cognitive deficits [sic] and psychotic symptoms.

Dr. Brown, a clinical psychologist also employed at ELMHS, stated that she performed several tests on Mr. Boys to determine his level of cognitive functioning and the level of effort in his performance during evaluations. She testified that Mr. Boys' refusal to participate in most of the tests limited the data she was able to

collect.[34]   As with Dr. Thompson, Dr. Brown observed Mr. Boys' noticeably different behaviors during evaluations and during times when he was not being evaluated. Dr. Brown advised that a refusal to participate in the examinations was one indicia of malingering.  She concluded that she did not "see something definitive to say that [Mr. Boys] would be unable to rationally understand the proceedings against him, or assist in his defense."

On cross-examination, Dr. Brown testified that Mr. Boys' sub-average scores on two IQ tests did not necessarily "reflect actual true impairment" because of the failure to administer "validity testing" alongside the IQ tests. She elected not to administer an adaptive functioning evaluation because she "didn't ever trust that [she] was getting valid results from him." [35]  Consequently, Dr. Brown could not validate Mr. Boys' diagnosis of mild intellectual disability due to an absence of data.

Dr. Vyas, a forensic psychiatrist also employed at ELMHS, reported similar results as Drs. Thompson and Brown regarding Mr. Boys' refusal to participate in the evaluations and his contradicting behaviors when he did not think he was under observation. Dr. Vyas stated that he diagnosed Mr. Boys with mild intellectual disability based on his previous sub-average IQ test scores, and included a diagnosis of psychosis not otherwise specified. His diagnosis of psychosis was based solely on Mr. Boys' self-reported audio hallucinations, but he explained that

---

[34] Two tests administered by Dr. Brown included the Montreal Cognitive Assessment, designed for individuals with low verbal skills, and a version of the REY-15 Item Memory Test, adapted specifically for increased sensitivity to intellectual disability. Mr. Boys scored a zero on the Montreal Cognitive assessment test and a two on the REY-15 Item Memory test.  Dr. Brown explained that Mr. Boys' scores and responses were not typical of patients with a mental illness or intellectual disability.

[35] Dr. Brown explained that some level of skepticism is expected on testing done in a court-ordered setting, as there may be incentive for a defendant to underperform.

the purpose of including the "not otherwise specified" language was due to a lack of data and/or contradictory behavior. Dr. Vyas also indicated that he prescribed anti-psychotic medication and anti-depressants to Mr. Boys based solely on Mr. Boys' self-reported symptoms. Nonetheless, Mr. Boys continued to report the same symptoms and refused to cooperate with the evaluations, despite several adjustments in his medication.

Dr. Vyas further testified that no "litmus test" exists to formally determine malingering, but he took into consideration (1) Mr. Boys' incentive to feign symptoms to avoid prosecution for a serious charge; (2) marked discrepancies between Mr. Boys' claimed symptoms and his observable behavior; (3) Mr. Boys' lack of cooperation with attempts to determine his competency; and (4) a suspected presence of "anti-social personality disorder." Dr. Vyas stated that his ultimate opinion rested on a legal presumption of competency in light of Mr. Boys' refusal to participate or cooperate with the evaluations. He could not say definitively that Mr. Boys was competent, but he "did not see any barriers that would interfere with his ability to at least cooperate with the examination if he chose to do so."

On cross-examination, Dr. Vyas explained that if Mr. Boys "chose to participate in it, we believe that he would be competent." Dr. Vyas added that he did not think that "voices" prevented Mr. Boys from cooperating, but rather that Mr. Boys "made up in his head" not to cooperate with the process. In response to the trial court's examination, Dr. Vyas also testified that the single psychotic episode Mr. Boys suffered in 2014, in which he claimed voices caused him to jump from a window, did not indicate "a history of psychiatric illness," as suggested by defense counsel. Rather, Dr. Vyas suspected the psychosis had been caused by either substance abuse or withdrawal from a substance.

Dr. McConville, Mr. Boys' expert, testified that Mr. Boys' intellectual disability caused his inability to participate in the mental evaluations. He indicated that Mr. Boys could not understand the questions. He also maintained that Mr. Boys' substandard answers on administered tests were caused by an inability to understand, as underscored by Mr. Boys' respective IQ scores of fifty-nine and sixty-two, rather than an unwillingness to participate. Dr. McConville admitted that Mr. Boys may also have been dishonest in some of his answers regarding his claimed inability to remember the events surrounding the crime for which he was charged, as well as his claimed inability to remember the fecal incident. Dr. McConville concluded that Mr. Boys remained incompetent, notwithstanding the considerable evidence that Mr. Boys was "malingering some of his symptoms." Dr. McConville pointed to a lack of affirmative evidence that Mr. Boys was, in fact, competent.

Following argument, the trial court ruled as follows:

> So having gone over the testimony that was elicited today, throughout the course of lengthy testimony from this morning. I'll note for the record that on October the 19th, when we originally had our competency evaluation, the goal really was more, out of an abundance of caution, finding Mr. Boys incompetent to proceed, based on the aberrant behavior he displayed in front of a jury pool of about 100 people.
>
> But even then, the goal really was dual. And that was to finally put to bed this issue of malingering that was raised by both Dr. Deland and Dr. McConville upon their testimony on October 19th, as well as the testimony that I accepted from Dr. Richoux and Dr. Salcedo on that issue.
>
> Now, having heard what took place during the course of Mr. Boys' participation, or lack thereof at ELMHS for these last few weeks. I'll note for the record the following:

55

In my opinion, he exhibited clearly manipulative behavior on October 18th and hijacked the course of the trial proceedings then. And that now has been confirmed as malingering—in my opinion—based on the testimony of Drs. Thompson and Vyas and Dr. Brown, and even Dr. McConville. Now we have someone who's been observed 24/7, who's clearly exhibiting behavior—when he's being observed, and he's not aware of it—that is completely counter to the way he behaves when he is being questioned by doctors. And I find that it's clearly manipulative in nature. I do find that he is a malingerer. And he will no longer be allowed to control these proceedings. They will go back to being as it should be, with a trial date.

And he's now rendered competent. And he will stay within the confines of Orleans Justice Center, or wherever they wish to put him. But he's not going back to the hospital. And I'll also note for the record that malingering and psychological tests that I ordered on October 19th were attempted to be administered. And Mr. Boys chose not to participate in those tests. Again, a volitional act of Mr. Boys.

He is choosing when and if he wishes to participate—to his detriment. I will note that it's to his detriment. But I don't think it's based on anything other than the fact that he continues to display manipulative behavior when it's convenient to him.

The fact that he's engaging and being able to brew homemade wine in his room, and has contraband soap. And he can secrete a bag of feces, somehow, attached to his body, prior to trial, and keep that bag of feces for six hours, and have the presence of mind to know when to display it—you know—what's best for his purposes.

I just find that it strains the bounds of credulity that has anything to do with any kind of mental illness or defect. On the contrary, it's clear indication that he's a malingerer. With that said, let's pick a trial date.

Based on the testimony of the mental health experts and the comprehensive reasons supplied by the trial court, we disagree with Mr. Boys that the trial court only relied on the presumption of competency in finding Mr. Boys competent to stand trial after the Competency Hearing III. To the contrary, the record supports

that the trial court's finding was premised on substantial evidence of Mr. Boys' malingering. The trial court found Mr. Boys incompetent at the Competency Hearing II out of an abundance of caution and sent him to ELMHS specifically to determine the malingering issue. In finding Mr. Boys competent to stand trial following the Competency Hearing III, the trial court concluded that Mr. Boys staged the fecal incident in an effort to manipulate the proceedings.

We note that every ELMHS doctor who testified at the final competency hearing concluded that Mr. Boys was either malingering or feigning his claimed disabilities based on the scientific tests they administered (or attempted to administer) and testified that Mr. Boys' observed behavior when he was not being formally evaluated was in direct contradiction to his performance when he knew he was being examined. We thus find that, based on the totality of the testimony and evidence offered at the Competency III Hearing, the trial court did not abuse its discretion in finding Mr. Boys competent to stand trial. *See State v. Holmes*, 06-2988, p. 12 (La. 12/2/08), 5 So.3d 42, 55 ("[a]lthough a trial court may receive expert medical testimony on the issue of a defendant's competency to proceed to trial, the ultimate decision of capacity rests alone with the trial court. . . . A reviewing court owes the trial court's determination of a defendant's mental capacity great weight, and its ruling should not be disturbed in the absence of manifest error.")(citations omitted).

Notwithstanding that Mr. Boys was found competent, Mr. Boys also complains the trial court failed to make further inquiries into Mr. Boys' on-going incompetency claims raised subsequent to the Competency III hearing. He specifically notes that defense counsel continuously represented that Mr. Boys could not assist in his defense because he had difficulty communicating with and

understanding counsel. In support of his argument, Mr. Boys points to the following exchange which took place near the start of trial:

> The Court: Let the record reflect defendant, Travis Boys, is present with his attorneys, as is the State. The Jurors are in the Jury room at this time and will remain sequestered for purposes of any pretrial matters.
>
> First, pursuant to Code of Criminal Procedure, Article 832 I'm hereby warning you, Mr. Boys, that any disruptive conduct whatsoever will result in your removal from this courtroom. That includes, but is not limited to, any efforts on your part to show the Jurors that you are shackled into your seat.
>
> Any effort to stand up, that will constitute an immediate removal of you from this courtroom. Do you understand?
>
> Defendant: (No audible response.)
>
> Defense Counsel: He said no.
>
> The Court: You don't understand what I just said?
>
> Defendant: (shakes his head negatively.)
>
> The Court: I will note for the record that you understood on Wednesday. When I gave you the same admonitions, and I repeated the exact same admonition I gave you Wednesday, you indicated you understood. Anything else?
>
> The State: Yes, Your Honor. I think we have a couple of just minor pretrial matters to handle. Mr. Sothern?
>
> Defense Counsel: Billy Sothern and Matt Vogel present at the counsel table for Mr. Boys. As to just the last issue that occurred, I understand the Court. We are moving forward with the trial today. I just want to make clear that Mr. Vogel and I continue to have the same issues concerning competency and communication with our client. I understand the Court has already ruled on those issues but I just wanted to just make the record clear that the kinds of engagements that the Court had with the defendant this morning are similar to engagements that we sometimes have with him, which is to say, difficulty

58

> communicating with him, him understanding what we are saying.
>
> The Court: I find that to be completely disingenuous, noting for the record that Mr. Boys has been medicated since he has returned and the fact that I have already deemed him to be malingering and the fact that he indicated he fully understood what I admonished him about less than five days ago and now, conveniently, on the eve of beginning opening statements, he mysteriously no longer understands, despite the fact that he is medicated. So I'll note what you put on the record.

Contrary to Mr. Boys' assertions, we find the above exchange reflects the trial court did review Mr. Boys' subsequent claims of incompetency. Citing its finding that Mr. Boys was a malingerer, the trial court determined those subsequent claims were baseless. A trial court does not abuse its discretion to refuse further inquiry into a defendant's competency when no new evidence has been offered since the last competency finding. *See State v. Johnson*, 14-0238, p. 11 (La. App. 5 Cir. 11/24/14), 165 So.3d 961, 969. Here, Mr. Boys presented no new evidence; instead, Mr. Boys re-urged claims of incompetency raised and considered at the previous competency hearings. Accordingly, we find no abuse of the trial court's discretion in determining that Mr. Boys was competent to stand trial subsequent to the Competency Hearing III.

### *Testimony of Dr. Salcedo and Dr. Richoux*

In assigned errors numbered 8, 9, and 10, Mr. Boys argues that Dr. Richoux's and Dr. Salcedo's testimonies (collectively, the "testimonies") should not have been admitted into evidence in determining Mr. Boys' competency or whether he had a mental defect. In assigned error number 8, Mr. Boys alleges that the testimonies violated his right against self-incrimination in that Mr. Boys had been promised that the contents of the sanity commission interview would not be

used against him. Assigned error number 9 asserts that the testimonies on intellectual disability were scientifically unsound and did not comport with *Daubert* standards;[36] and, assigned error number 10 alleges that the trial court should have precluded the testimonies about their clinical evaluations of Mr. Boys based on the trial court's pre-trial ruling that testimony regarding Mr. Boys' competency was inadmissible.

In assigned error number 8, Mr. Boys contends that Dr. Salcedo and Dr. Richoux violated his right against self-incrimination after "[t]hey told him, 'Nothing you say will be used against you in trying to convict you. We are not going to get you in any trouble.'"

In commencing our review, we initially note that Mr. Boys put his mental capacity at issue when he entered a plea of not guilty and not guilty by reason of insanity, requested the first appointment of the sanity commission, and re-urged the competency issue after the fecal incident. Here, the State called Dr. Salcedo and Dr. Richoux as rebuttal witnesses to refute Dr. Deland's testimony that Mr. Boys had a mental defect. Such rebuttal testimony is statutorily permissible pursuant to La. C.Cr.P. art. 765.[37] Moreover, when a defendant introduces expert testimony that he lacked the mental capacity to commit an offense, the State is entitled to rebut that testimony. *Kansas v. Cheever*, 571 U.S. 87, 93 (2013).

In *Cheever*, the defendant put his mental state at issue by claiming his voluntary intoxication negated his ability to form specific intent and by offering expert testimony that his long-term drug use had damaged his brain. 571 U.S. at

---

[36] *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993).

[37] La. C.Cr.P. art. 765 provides, in part, that the normal order of trial shall be as follows:

> (5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. . . .

91. The defendant then objected to the state's introduction of expert rebuttal testimony from the doctor who conducted the court-ordered evaluation, arguing that the doctor's testimony would violate the Fifth Amendment because his impressions were based in part on an involuntary examination. *Id.*, at 91-92. The Supreme Court ultimately held that the admission of the expert rebuttal testimony did not violate the Fifth Amendment, citing to and affirming its prior holding in *Buchanan v. Kentucky,* 483 U.S. 402 (1987). The *Cheever* Court stated:

> The rule of *Buchanan,* which we reaffirm today, is that where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal. *Ibid.* Any other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state at the time of the alleged crime.

> The admission of this rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination. A defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."

571 U.S. at 93-94 (citing *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900)).

Mr. Boys maintains that *Cheever* does not apply in the present matter. Instead, he relies on *Estelle v. Smith*, 451 U.S. 454 (1981) to support his argument that the State cannot offer evidence of a defendant's compelled mental health evaluation absent a voluntary waiver by the defendant. In *Estelle*, the United States Supreme Court ruled that a court-ordered psychiatric examination violated the defendant's Fifth Amendment rights when the defendant did not initiate the examination or put his mental health in dispute at trial.

We find *Estelle* clearly distinguishable from the instant matter. In this case, Mr. Boys not only put his mental health in dispute, but he also initiated

61

appointment of the sanity commission, which included Dr. Salcedo and Dr. Richoux. Accordingly, the trial court's allowance of Drs. Salcedo's and Richoux's rebuttal testimony did not violate Mr. Boys' right against self-incrimination.[38]

In related assigned error number 10, Mr. Boys contends that the testimonies of the State's experts should have been precluded based on the trial court's pre-trial ruling that granted the State's motion to exclude evidence at trial of Mr. Boys' competency evaluations once Mr. Boys had been deemed competent.

In granting the motion, the trial court ruled that "there will be no reference to the process by which Mr. Boys was examined for purposes of competency and no testimony will be elicited from either State's witnesses, or in particular, Dr. McConville [defense witness] should he be called by the Defense in regards to competency. . . ." Based on that limiting instruction, Mr. Boys claims he was prejudiced because the defense abided by the instruction and did not ask Dr. Deland questions about his competency or her competency evaluations; whereas the trial court allowed the State to elicit competency testimony from Dr. Salcedo and Dr. Richoux.

---

[38] Mr. Boys applied for a review of the trial court's order admitting the testimony of Drs. Salcedo and Richoux during the State's rebuttal case; and this Court denied his writ application. *State v. Boys*, 18-0241 (La. App. 4 Cir. 3/23/18) (*unpub.*), *writ denied*, 18-0461 (La. 3/26/18) (*unpub.*), stating:

> Relator, Travis Boys, seeks review of the district court's March 22, 2018 judgment, which denied Relator's motion to exclude the testimony of court-appointed doctors as rebuttal testimony to Relator's sanity defense and denied Relator's oral motion requesting testimony of the doctors to establish that their conclusions and opinions resulted from their interviews with Relator. Upon review, Relator's writ is denied. *See Kansas v. Cheever*, 571 U.S. 87, 134 S.Ct. 596, 187 L.Ed.2d 519 (2013), where the United States Supreme Court, in distinguishing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), held that the prosecution could introduce evidence from defendant's court-ordered mental evaluation to rebut defendant's expert testimony.

When Mr. Boys challenged the propriety of Drs. Salcedo's and Richoux's rebuttal testimonies at trial, the trial court responded as follows:

> Just to be abundantly clear, the issue of what statements, if any, [Mr. Boys] made to any mental health expert and what was admissible was not addressed until defense rested their case and raised an objection to the possibility of Drs. Richoux or Salcedo testifying to statements made to them during the course of a competency hearing.
>
> The only limitations that were expressed prior to the beginning of this trial were limitations for any mental health expert to refrain from addressing any kind of competency evaluation or the incident that took place during the course of the aborted trial attempt in October.

Therefore, the question before this Court is whether the doctors' rebuttal testimonies fell within the trial court's limitations for admissible testimony from the mental health experts regarding whether Mr. Boys had a mental defect or disease. We find that it did.

Because Mr. Boys had been found competent to stand trial, the trial focused on whether the evidence supported or refuted Mr. Boys' plea of not guilty and not guilty by reason of insanity. The insanity defense as enunciated in La. R.S. 14:14 provides that a defendant shall be exempt from criminal culpability "[i]f the circumstances indicate that because of a mental disease or a mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question. . . ." As with the question of competency, the first prong of an insanity defense requires proof of a mental defect or disease. The second prong requires proof that the defendant could not distinguish between right and wrong at the time of the offense.

Dr. Deland was Mr. Boys' expert witness called to support his insanity defense. As to the first prong of the insanity defense, proof of mental defect or

disease, the defense questioned Dr. Deland extensively regarding the substance of her two evaluation interviews with Mr. Boys and statements Mr. Boys made in those examinations. In particular, Dr. Deland testified that Mr. Boys reported hearing voices in the first interview following the fecal incident. She concluded he had some type of psychotic disorder. Dr. Deland's direct examination established, in part, that she reached her opinions of Mr. Boys based on impressions formed during her competency evaluations.

Thus, the record clearly refutes Mr. Boys' claim that the defense did not examine Dr. Deland about her underlying findings from her competency evaluations and Mr. Boys' statements made during her evaluation interviews.[39]

---

[39] Indeed, the trial testimony was as follows:

Defense: And you have interviewed [defendant], correct?

Dr. Deland: Yes.

Defense: How many times have you interviewed him?

Dr. Deland: Twice.

Defense: And you asked him a full range of questions, right?

Dr. Deland: Yes.

. . . .

Defense: And are there indications both in the records and in your interviews with [defendant] that [he] was using Norco at this time?

Dr. Deland: He was…

. . . .

Defense: The first time you met [defendant] he was unmedicated, correct?

Dr. Deland: That was before he went to the hospital, yes.

Defense: And would you describe his thought process the first time you met him as disorganized?

Dr. Deland: Yes. When I met with him the first time his thoughts were scattered. It got worse as the interview progressed to the point that I had to keep reigning him back in and

The defense's examination of Dr. Deland was not restrained or curtailed in any fashion. Ultimately, Dr. Deland concluded that Mr. Boys had a mental defect, although she had no opinion as to whether Mr. Boys knew right from wrong at the time of the offense. As such, the State was entitled to rebut Dr. Deland's testimony that Mr. Boys suffered from a mental disease or defect—a required predicate for the affirmative defense of not guilty by reason of insanity—with Drs. Salcedo's and Richoux's testimonies.

Drs. Salcedo's and Richoux's testimonies established that they reviewed essentially the same records and evidence as Dr. Deland in reaching their conclusions that Mr. Boys was not mentally disabled and could distinguish right from wrong at the time of the crime. Contrary to Mr. Boys' representations, neither Dr. Salcedo nor Dr. Richoux testified during rebuttal that he had performed examinations of Mr. Boys for the purpose of specifically determining Mr. Boys' competency to stand trial nor did either doctor provide any opinion on Mr. Boys' competency. As with Dr. Deland, they offered general impressions of Mr. Boys based on their observations. Accordingly, the testimonies of Drs. Salcedo and

---

sometimes he just said things that were off topic. He also showed increasingly—increasing—what we call latency of response, which is where you ask a question and it's the amount of time that somebody sits before they answer, and that [sic] increasingly longer as the interview progressed.

He also reported hearing voices and he did also appear to me at times that he may be what we call responding, meaning listening to something I couldn't hear. So in that evaluation I did think that he was displaying some psychotic symptoms. I mean it is easy to say, "I'm hearing voices," and you may or not be. It is a lot harder to mimic having disorganized thoughts or that latency response.
So taking everything—all of the information that I had into consideration, I did think that he had some type of a psychotic disorder.

Notably, Dr. Deland continued to testify concerning her second examination of Mr. Boys, which also included substantive references to Mr. Boys' statements and observed behaviors therein. The State did not object to this testimony.

65

Richoux met the requirements of rebuttal testimony and adhered to the guidelines the trial court set regarding the admissibility of mental defect or disease evidence.

This assignment of error is without merit.

### *Intellectual Disability Testimony*

In assigned error number 9, Mr. Boys argues that the doctors' testimonies attesting that he did not have an intellectual disability should have been barred because it was based on unscientific data. Mr. Boys maintains that the doctors disregarded IQ tests which placed his IQ scores at 62 and 59 and that the doctors' dismissal of those scores as indicators of Mr. Boys' mental defect was based on "gut instinct" rather than scientific data.

Mr. Boys' "gut-instinct" allegation originates from Dr. Salcedo's testimony at the Competency Hearing I wherein Dr. Salcedo discounted Mr. Boys' IQ test scores because they did not correlate with Dr. Salcedo's clinical observation of Mr. Boys. Dr. Salcedo referenced an incident wherein he and Dr. Richoux had recently examined a patient who was "truly intellectually disabled" and lamented that he had not taken a video to show the trial court the difference between that patient and Mr. Boys. Dr. Salcedo disagreed with defense counsel that clinical interaction was inadequate to determine the existence (or non-existence) of an intellectual disability, and disagreed that his opinion was a "gut instinct." We note that this testimony did not take place at the trial on the merits. Accordingly, it is not relevant to any determination regarding Drs. Salcedo's or Richoux's expertise to testify at trial regarding Mr. Boys' intellectual disability.[40]

---

[40] Procedurally, Mr. Boys filed a motion in limine to strike Dr. Salcedo's intellectual disability findings prior to the first trial. The motion was heard at an October 18, 2017 pre-trial hearing. The State argued that the motion was premature as the State did not intend to call Drs. Salcedo or Richoux in its case in chief. Although Mr. Boys now claims that the trial court denied his

At trial, Mr. Boys did not object to Drs. Salcedo's or Richoux's testimonies concerning their methods of evaluation. Nor did Mr. Boys argue that the doctors utilized un-scientific methods to determine that he did not suffer from mental disease or defect. As noted herein, Dr. Salcedo's trial testimony discussed the shortcomings of the IQ tests, opining that IQ scores alone were insufficient to render a diagnosis of intellectual disability without performing a measure of adaptive functioning evaluation. Although Mr. Boys now complains that Dr. Salcedo's intellectual disability findings are not reliable and are unscientific because Dr. Salcedo could not remember the three domains of intellectual disability and name the four categories of adaptive functioning, at the time of trial, Mr. Boys had already stipulated to the expertise of both Drs. Salcedo and Richoux.

The competency of an expert witness is a fact question to be determined based on the sound discretion of the trial court and will not be disturbed in the absence of manifest error. *State v. Higgins*, 03-1980, p. 33 (La. 4/1/05), 898 So.2d 1219, 1239-40 (quoting *State v. Stucke*, 419 So.2d 939 (La. 1982)). Here, both doctors were qualified as expert witnesses pursuant to stipulations from Mr. Boys. They testified within the scope of their expertise. The defense had every opportunity to cross-examine the doctors regarding their methods, findings, and analysis, and did so extensively. Thus, we find no error in the trial court's decision to permit Drs. Salcedo and Richoux to testify regarding Mr. Boys' intellectual disability.[41] This error has no merit.

_____

motions to exclude the testimony or, in the alternative, for a *Daubert* hearing, the record reveals no ruling by the trial court; instead, the trial court held its ruling in abeyance. The motion was not raised again at the actual trial on the merits.

[41] We also note that any error in permitting Drs. Salcedo and Richoux to testify to refute that Mr. Boys had a mental disability would essentially amount to harmless error. Regardless as to

67

*Fecal Incident*

Mr. Boys next argues in assigned error number 11 that the trial court erred in not allowing the fecal incident into evidence at trial to prove he had a mental defect. The State counters that the evidence was irrelevant to the proceedings under La. C.E. art 403, and would have served to confuse the jury. We agree with the State.

La. C.E. art. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

The trial court conducted the Competency Hearing II and the Competency Hearing III, in significant part, to address whether the fecal incident was evidence of a possible mental disease or defect. Dr. Salcedo, Dr. Richoux, and the ELMHS mental health doctors concluded that it was not. Mr. Boys' own experts, Dr. McConville and Dr. Deland, concluded that the fecal incident was not relevant to their findings as to whether Mr. Boys had a mental defect. In particular, Dr. McConville testified at the Competency Hearing II, which took place the day following the incident, that he "didn't think that the feces incident had any bearing on [his] opinion about [Mr. Boys'] competency."

During the entirety of the proceedings in this matter, Mr. Boys did not present any testimony that the fecal incident was a symptom of psychosis or mental disease or defect, let alone that it was a mental defect that impacted his ability to distinguish right from wrong for purposes of proving his insanity defense. The

whether Mr. Boys had a mental defect, Mr. Boys failed to put forth any evidence that he did not know right from wrong at the time of the offense in order to prove an insanity defense.

incident was, thus, not relevant. Accordingly, the trial court did not abuse its discretion in excluding reference to that event during trial.

This assignment of error is meritless.

*ASSIGNMENT OF ERROR NO. 12*

In this assignment of error, Mr. Boys argues that the presence of uniformed police officers at trial and the wearing of an honor badge by one testifying officer prejudiced his right to a fair trial.[42] Mr. Boys maintains that the very presence of the officers created an "impermissible visual reference," causing inherent prejudice to his right to a fair trial.

In our examination of this error, we first recognize that no jurisprudential or statutory authority exists that prohibits or assigns a presumption of prejudice to the attendance of police officers at a trial involving the killing of another officer. Instead, the standard to determine the propriety of police officers' attendance at trial is the same one applied to the general public. In considering whether the presence of armed uniformed troopers sitting in the front row of the courtroom was impermissibly prejudicial, for example, the United States Supreme Court stated in *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986) that all the reviewing court should do is

> look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

---

[42] Officer Warter wore the honor badge, which commemorates the death of a slain officer, during his testimony.

In *Holbrook*, during the armed robbery trial of six co-defendants, four uniformed state troopers were added to the customary courtroom security force and were seated in the first row of the spectator's section of the court. The United States Supreme Court found that the mere presence of troopers was not so prejudicial as to deprive the defendant of a fair trial.

A defendant, however, may be entitled to relief from a prejudicial trial environment where the press or the general public creates a carnival atmosphere, cause considerable disruption, and the trial court has lost its ability to supervise the trial. *See Jones v. Davis*, 890 F.3d 559, 569 (5th Cir. 2018) (citations omitted). Louisiana jurisprudence also provides that criminal convictions may be set aside by audience conduct which unduly influences the jury against a defendant to the extent the conduct infringes on a defendant's right to a fair trial. *State v. Allen*, 276 So.2d 868, 871 (La. 1973).

In this matter, other than the mere presence of the uniformed police officers, Mr. Boys cites to no specific conduct by the officers that created a "carnival" atmosphere or disruption. As to honor badge concerns, Mr. Boys does not demonstrate that the jury was even aware of the badge or its significance. Likewise, Mr. Boys does not show that the trial court lost control over the trial proceedings. In fact, the opposite was shown. The trial court's jury instruction included the following:

> You must determine whether [or] not a fact has been proven only from the evidence presented or from a lack of evidence. The evidence which you should consider consists of the testimony of witnesses and of exhibits, such as, writings and physical objects, which the Court has permitted the parties to introduce. You must consider only evidence that was admitted during the trial.

> . . . .

> As Jurors, you are not to be influenced by mere sympathy, passion, prejudice or public opinion. You are expected to reach a just verdict.

Accordingly, we find the mere presence of the police officers or the wearing of honor badges was not inherently prejudicial. Mr. Boys offered no evidence to the contrary. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 13

In this assignment of error, Mr. Boys asserts that the trial court erred in imposing the mandatory sentencing of life imprisonment at hard labor with no benefit of parole, probation, or suspended sentence. He argues that the sentence constitutes cruel and unusual punishment "[g]iven his intellectual disability, history of psychosis, and severe childhood trauma."

A statutory sentence may be found constitutionally excessive only if it "'makes no measurable contribution to acceptable goals of punishment,' or is nothing more than 'the purposeful imposition of pain and suffering' and is 'grossly out of proportion to the severity of the crime.'" *State v. Johnson*, 97-1906, p. 8 (La. 3/4/98), 709 So.2d 672, 676 (quoting *State v. Dorthey*, 623 So.2d 1276, 1280 (La. 1993)). "This Court has held that a trial court does not err in imposing the sentence mandated by statute where a defendant fails to demonstrate, with clear and convincing evidence, that he is an exception and should, therefore, receive less than the mandatory minimum sentence." *State v. Moore,* 01-2105, pp. 7-8 (La. App. 4 Cir. 2/13/02), 809 So.2d 520, 525 (citing *State v. Finch*, 97-2060, p. 13 (La. App. 4 Cir. 2/24/99), 730 So.2d 1020, 1027)).

In this case, Mr. Boys was charged with the first degree murder of a police officer, a capital offense for which an offender can be punished by death or life imprisonment. *See* La. R.S. 14:30(C)(1). The State elected not to seek the death penalty. When that occurs, La. R.S. 14:30(C)(2) imposes a mandatory sentence of life imprisonment without the benefit of parole, probation, or suspended sentence.

Mr. Boys argues that it is a "given" that he, in fact, suffered from a mental disease/defect or an intellectual disability, which rendered a life sentence unconstitutional for the intentional murder of Officer Holloway. While the testimony at trial conflicted as to the extent of Mr. Boys' intellectual disability, if any, in the event he had an intellectual disability, our sentencing guidelines provide only that those with intellectual disabilities shall not be put to death.[43] In this case, Mr. Boys was not subjected to a death sentence. Moreover, as discussed herein, the trial court found Mr. Boys to be manipulative and a malingerer and further found that his claimed mental or intellectual disability was no more than a ruse to subvert the proceedings and avoid responsibility for his crime.

We recognize that a trial court may make a downward departure from a mandatory sentence if it finds that a sentence makes no measured contribution to society pursuant to *Dorthey*, 623 So.2d at 1280. However, in the case *sub judice*, the trial court found a downward departure was not warranted due to the horrendous nature of the crime, Mr. Boys' attempts to conceal his identity after the murder, Mr. Boys' failure to accept responsibility for his actions, and his extensive criminal history. In denying Mr. Boys' motion for reconsideration of his life

---

[43] La. C.Cr.P. art. 905.5.1(A) provides that "no person with an intellectual disability shall be subjected to a sentence of death."

sentence, the trial court reasoned that "[a]fter careful consideration of the evidence that was elicited throughout the trial of [Mr. Boys], I find no basis to grant that."

Our jurisprudence establishes that a "trial judge is given wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed excessive in the absence of manifest abuse of discretion." *State v. Ballard*, 02-2431, p. 3 (La. App. 4 Cir. 5/28/03), 848 So.2d 722, 724 (citing *State v. Howard*, 414 So.2d 1210 (La. 1982)).

The record of this matter clearly substantiates the trial court's imposition of a sentence of life imprisonment. We thus find the trial court did not abuse its discretion in imposing the mandatory life sentence.

This assigned error has no merit.

**ASSIGNMENT OF ERROR NO. 14**

Mr. Boys' final assignment of error asserts that, although a single error may not warrant relief, the cumulation of errors cannot be considered harmless.

Our jurisprudence provides that "the combined effect of assignments of error, none of which warrants reversal on its own, does not deprive a defendant of his right to a constitutionally fair trial." *State v. McElveen*, 10-0172, p. 57 (La. App. 4 Cir. 9/28/11), 73 So.3d 1033, 1071-1072 (citing *State v. Copeland*, 530 So.2d 526, 544-45 (La. 1988). The *McElveen* Court also noted that the "cumulative error" doctrine has lost favor in the Louisiana courts. *Id*., at pp. 57-58, 73 So.3d at 1072 (commenting that "the Supreme Court in *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, *quoted with approval* [the case of] *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir.1987), where the federal court rejected the cumulative error doctrine by noting that 'twenty times zero equals zero.'").

In the present case, Mr. Boys failed to show prejudice as a result of any of the singular alleged errors. Thus, he cannot show that their combined effect entitles him to relief. Contrariwise, the State presented overwhelming evidence of Mr. Boys' guilt. Most notably, the State introduced the body camera video that depicted Mr. Boys' actual shooting of Officer Holloway and his escape from custody. Mr. Boys conceded his identity as the shooter in the video. The State also offered video surveillance and body camera footage of Mr. Boys' subsequent attempts to avoid detection as the perpetrator and his flight from arresting officers once he realized he had been identified.

The jury heard expert testimony and saw reports authored by several doctors who evaluated Mr. Boys throughout the course of his life. No mental health experts, including Mr. Boys' expert, testified that he was unable to distinguish right from wrong at the time of the offense arising out of his claims of a mental disease or defect. Although Mr. Boys had been found competent, the State nonetheless rebutted his on-going objection to his competency with several exhibits, including jailhouse phone calls, showing that Mr. Boys was at least capable of recalling events, understanding rules, holding thoughtful conversations, and making arrangements concerning his defense. As such, Mr. Boys' claim of cumulative error lacks merit.

**CONCLUSION**

For the foregoing reasons, we find no merit to any of Mr. Boys' claims on appeal. Accordingly, Mr. Boys' conviction and sentence are affirmed.

**AFFIRMED**